**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

MARGARET WILLIAMS,                    )
                                      )
          Plaintiff,                  )
                                      )
vs.                                   )          CASE NO. 1:07CV1108-MHT
                                      )
WAL-MART STORES, INC., ET AL.,        )
                                      )
          Defendant.                  )

BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant WAL-MART STORES EAST, L.P. ("Wal-Mart"), incorrectly named in the Complaint as WAL-MART STORES, INC., moves this Honorable Court pursuant to Federal Rule of Civil Procedure 56 for entry of Summary Judgment in its favor as to all claims against it and as grounds for said motion, represents and shows unto the Court that there is no genuine issue as to any material fact and Defendant Wal-Mart is entitled to summary judgment. In further support thereof, Defendant Wal-Mart submits this brief in support of its Motion for Summary Judgment as follows:

NARRATIVE STATEMENT OF UNDISPUTED FACTS[1]

On March 11, 2007, Plaintiff entered Wal-Mart Store #1063 in Geneva, Alabama with her sister in order to purchase a gallon of milk. (Deposition of Plaintiff Margaret Williams, attached as Exhibit "A", p. 11.) As she was exiting the store, she slipped and fell, and allegedly injured her knee and hip. (Pl. Dep. pp. 14, 21.) Plaintiff did not see what she slipped on prior to or after she fell, and she did not notice anything on her

---

[1]  Wal-Mart offers the following Narrative Statement of Undisputed Facts for purposes of this motion, which requires such facts be viewed in a light most favorable to the Plaintiff.

clothes or shoes subsequent to her fall. (Pl. Dep. pp. 16-18, 36, 45.)  Plaintiff's sister, Marie Strickland, claims that she saw a clear puddle of water on the floor after her sister fell, but acknowledges that she passed through the same exit area of the store moments before her sister and did not see anything on the floor. (Deposition of Marie Strickland, attached as Exhibit "B", pp. 8-9, 12-13.)  Several Wal-Mart employees inspected the floor near and around where Plaintiff fell but could not find anything that would have caused her to fall, including water.  (Deposition of Phillip Woods, attached as Exhibit "C", pp. 26, 27, 35, 43, 54; Deposition of Deborah Elmore, attached as Exhibit "D", pp. 29, 32; Deposition of Laura Lavallee, attached as Exhibit "E", p. 28; Deposition of Annie Newman, attached as Exhibit "F", p. 34.)  Because employees did not find any substance on the floor, no maintenance or clean up of any kind was necessary after Plaintiff departed the store.  (Elmore Dep. p. 34; Newman Dep. p. 44.)

At the time of Plaintiff's incident, Wal-Mart's policy and procedure was to have managers monitor and survey the entire store at least every two hours in order to look for any potential safety issues and, if necessary, to eliminate any potential hazards.  (Woods Dep. pp. 17, 19; Elmore Dep. pp. 53-54.)  The cashiers are also constantly reviewing the front end of the store to check for any safety issue or hazards.  (Elmore Dep. p. 33; Newman Dep. p. 33; LaVallee Dep. p. 17.)  In addition, all employees are trained to constantly monitor the floors in order to prevent accidents.  (Lavallee Dep. p. 17; Elmore Dep. p. 54; Woods Dep. p. 17; Newman Dep. p. 33.)  On the day of Plaintiff's incident, no employee observed any substance on the floor near where Plaintiff fell, before or after the incident. (Newman Dep. p. 34; Woods Dep. p. 26, 44; Elmore Dep. p. 29; LaVallee Dep. p. 28.)  Neither did the Plaintiff.  (Pl. Dep. pp. 16-18.)

Plaintiff filed her Complaint in the Circuit Court of Geneva County on August 16, 2008, alleging state law causes of action based on negligence and wantonness. (Doc. 1, Ex. A.) Defendants removed this action to the United States District Court for the Middle District of Alabama, Southern Division on December 19, 2007, based on diversity jurisdiction.

STANDARD OF REVIEW

Summary judgment is proper if the moving party shows that there is no genuine dispute regarding any material fact and it is entitled to judgment as a matter of law. *Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540 (11th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077 (11th Cir. 1990); Fed. R. Civ. P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Anderson*, 477 U.S. at 252. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249. Once a properly supported motion has been filed, the non-movant must come forward with sufficient evidence on each count that must be proved. *Earley*, 907 F.2d at 1080. If a [non-movant] fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

ARGUMENT

Wal-Mart owed Plaintiff as an invitee a duty to use reasonable care and diligence to keep the premises in a safe condition; or if the premises were in a dangerous condition, to give sufficient warning so that the invitee might avoid the danger by using ordinary care. *See Boudousquie v. Marriott Management Service Corp.,* 669 So. 2d 998, 1000 (Ala. 1995). The premises owner, however, must have reasonable notice of a defect to even trigger this duty. *See Fowler v. CEC Entertainment*, 921 So. 2d 428, 432-433 (Ala. Civ. App. 2005). "[T]he storekeeper is not an insurer of the customers' safety but is liable for injury only in the event he negligently fails to use reasonable care in maintaining his premises in a reasonably safe condition." *Dolgencorp, Inc. v. Hall,* 890 So. 2d 98, 101 (Ala. 2003) (citing *Ex parte Travis,* 414 So. 2d 956 (Ala. 1982)). Just because a customer is injured does not presuppose negligence on the part of the storekeeper. *Id.* She must prove that her "fall resulted from a defect or instrumentality on the premises; that the defect was the result of the defendant's negligence; and that the defendant had or should have had notice of the defect before the time of the accident." *Fowler,* 921 So. 2d at 433 (quoting *Hale v. Sequoyah Caberns & Campgrounds, Inc.,* 612 So. 2d 1162, 1164 (Ala. 1992)).

This burden was explained in *Rutledge v. Wings of Tuscaloosa, Inc.*, 848 So. 2d 1005 (Ala. Civ. App. 2002):

> The plaintiffs must prove that the injury was proximately caused by the negligence of the storekeeper or one of its servants or employees. *Actual or constructive notice of the presence of the substance must be proven before the storekeeper can be held responsible for the injury.* Furthermore, the plaintiffs must prove (1) that the substance slipped upon had been on the floor a sufficient length of time to impute constructive notice to [the storekeeper]; or (2) that the storekeeper had actual notice that the

substance was on the floor; or (3) that the storekeeper was delinquent in not discovering and removing the substance.

848 So. 2d at 1007 (punctuation and citations omitted) (emphasis added).

<u>Plaintiff Has Failed to Present Any Evidence of Notice</u>

Plaintiff's claims fail for lack of substantial evidence of notice. Wal-Mart acknowledges that, in the present case, Plaintiff, through testimony of her sister, has alleged that there was water on the floor where she slipped. (Strickland Dep. pp. 8-9.) Plaintiff, however, has offered no evidence that Wal-Mart created the alleged hazard or knew of the substance before her fall, nor is there any evidence that the substance had been on the floor for a sufficient length of time as to impute constructive notice to Wal-Mart. Ms. Strickland testified as follows:

> Q:    Do you have any idea where the water came from that you saw?
> A:    No, I don't.
> Q:    Was there a trail of it from anywhere, or was it just an isolated, as you explained, puddle?
> A:    As far as I know, just a puddle there. I was down on the floor by Margaret, and I guess that's when I noticed it.
> Q:    Okay. Did you see any track marks through it?
> A:    No, I didn't.
> Q:    It was a clear puddle of water?
> A:    It looked clear, yes.

(Strickland Dep. pp. 17-18.) Despite the fact that Ms. Strickland had walked by the same area and exited the store moments prior to her sister's incident, she did not notice anything on the floor at that time. (Strickland Dep. p. 13.)

As Wal-Mart employee Phillip Woods testified:

> Q:    Did you look to see what caused Ms. Williams to fall or if there was something on the floor that caused her to fall?
> A:    I didn't find anything on the floor that would have caused her to fall.
> Q:    But you made an affirmative effort to look for something?

A:    Yes, sir.  I felt of the floor and took pictures of the floor.

Q:    But, in your judgment, you didn't see anything that would have caused her to fall?

A:    No.

Q:    Did you see anything at all?

A:    Nothing.

Q:    Any kind of liquid?  Any kind of anything?

A:    Nothing.

Q:    As far as you could tell, the floor was dry?

A:    Correct.

Q:    Did you actually get down on the floor and feel of it, or did you just do it from visual observation?

A:    I actually touched it.

Q:    And what areas did you feel of?

A:    Close to where her feet were laying, and the, back away from it a couple of tiles.

(Woods Dep. pp. 26-27.)   Wal-Mart Assistant Manager Deborah Elmore also testified that she could not find anything on the floor which may have contributed to Plaintiff's fall.

Q:    Did you look around on the floor to try and determine a cause for Ms. Williams having fallen?

A:    Yes.  I did observe the floor.

Q:    And what did you observe?

A:    Absolutely nothing.  It was dry.  There was no debris. There was no sand.  There was no water.  There was nothing.

Q:    No nothing?

A:    No nothing.

(Elmore Dep. p. 29.)  While Wal-Mart maintains that there was no hazard on the floor which caused Plaintiff to fall, because the Court must view the evidence in light most favorable to the Plaintiff and assume there was a substance on the floor based on the testimony of Plaintiff's sister, there is no evidence indicating Wal-Mart knew of or had notice of the substance on the floor at the time of Plaintiff's alleged slip and fall.  Likewise, Plaintiff offered no evidence from which it might

be inferred that Wal-Mart was delinquent in not discovering and removing the offending substance so as to impute knowledge to Wal-Mart.

<u>Plaintiff Has Failed To Present Any Evidence as to the Length of Time<br>the Alleged Substance Was on the Floor</u>

The courts have permitted plaintiffs to prove constructive notice through evidence of the length of time a foreign substance has remained on the floor. *See e.g., Dunklin v. Winn-Dixie of Montgomery, Inc.,* 595 So. 2d 463, 464 (Ala. 1992); *O.D. Cash,* 418 So. 2d at 876 (citing *S.H. Kress & Co. v. Thompson,* 267 Ala. 566, 103 So. 2d 171 (1957)); *Maddox v. K-Mart Corp.,* 565 So. 2d 14, 16 (Ala. 1990). In these instances, the court allows the jury to infer the length of time a foreign substance has remained on the floor from the nature and condition of the substance. *See, e.g., Dunklin,* 595 So. 2d at 464. Such evidence includes a dirty condition, tracking, or other characteristics of the substance which makes it reasonable to infer that the substance was on the floor long enough to raise a duty on the defendant to discover and remove the hazard. *See O.D. Cash,* 418 So. 2d at 876. However, as the Court noted in *Speer v. Pin Palace Bowling Alley,* 599 So 1140, 1143 (Ala. 1992):

> Evidence [that] amounts to little more than speculation or conjecture as to the nature of the substance on the floor, as to the length of time the substance was on the floor, and as to whether the defendants were delinquent in not discovering the substance and cleaning it up is insufficient.

*Speer v. Pin Palace Bowling Alley,* 599 So. 2d 1140,1143 (Ala. 1992) (citing *Logan v. Winn-Dixie Atlanta, Inc.,* 594 So. 2d 83 (Ala. 1992) (holding that the plaintiff's testimony that she did not know what the substance was that caused her to slip afforded nothing more than speculation, conjecture, or guess and was wholly insufficient to warrant submitting the case to the jury); *East v. Wal-Mart Stores, Inc.,* 577 So. 2d 459 (Ala.

1991) (affirming a summary judgment for the defendant where the plaintiff and her only witness testified that they did not know how long the substance had been on the floor and that they did not believe that the defendant had any notice the substance was there until after the accident); *Brown v. Autry Greer & Sons, Inc.,* 551 So. 2d 1049 (Ala. 1989) (affirming a summary judgment for the defendant where the plaintiff presented no evidence to show that the defendant had actual or constructive notice of the substance in question or that the defendant was delinquent in not discovering or removing it); *Vargo v. Warehouse Groceries Mgt., Inc.,* 529 So. 2d 986 (Ala. 1988) (affirming summary judgment for the defendant where the plaintiff and her only witness testified that they had no idea how long the puddle of water on which the plaintiff had slipped had been on the floor, except that it "looked like it had been there for a while," and where there was no other evidence as to how long the water had been present on the floor or that the defendant had notice of it); *Cash v. Winn-Dixie Montgomery, Inc.,* 418 So. 2d 874 (Ala. 1982) (affirming a summary judgment for the defendant where there was no evidence that the defendant knew that the foreign substance had been on the floor for such a length of time "as to impute constructive notice"). In addition, the *Speer* court noted:

> Once a Defendant makes a *prima facie* showing that it had no actual constructive knowledge of the presence of a substance which caused a slip and fall, and that the Defendant was not derelict in failing to discover and remove the substance, the burden shifts to the Plaintiff to present substantial evidence that the alleged substance that caused the fall had been on the floor for such a length of time that constructive notice of its presence may be imputed to the Defendant or that the Defendant had actual notice of that of the substance on the floor or that the Defendant was delinquent in not discovering and removing the substance. *Speer v. Pin Palace Bowling Alley*, 599 So.2d 1140, 1143-44 (Ala. 1992).

The evidence presented by the Plaintiff relating to the alleged hazard is limited to the testimony of Marie Strickland, who testified that the water she saw subsequent to Plaintiff's incident was *clear and without track marks*.  (Strickland Dep. pp. 17-18.) Plaintiff did not present any evidence that the alleged substance had been on the floor for such a length of time as to impute notice to the Defendant, or that Wal-Mart was delinquent in not discovering and removing the substance.   Without any evidence indicating that Wal-Mart had actual or constructive knowledge of the offending substance on the store floor, Wal-Mart is entitled to judgment as a matter of law in its favor.  *Ex parte Wal-Mart Stores, Inc.*, 806 So. 2d at 1252.  *See also Richardson v. The Kroger Company*, 521 So. 2d 934, 936 (Ala. 1988).

WHEREFORE  Defendant  WAL-MART  STORES  EAST,  L.P.  respectfully requests this Honorable Court enter an Order granting summary judgment as a matter of law in its favor as to all claims asserted in Plaintiff's Complaint.

Respectfully submitted,

/s/ Jennifer A. Doughty
W. PEMBLE DELASHMET          (DELAW0873)
CHAD C. MARCHAND              (MARCC5089)
JENNIFER A. DOUGHTY          (DOUGJ5407)
Attorneys for Defendant, Wal-Mart Stores East, LP

OF COUNSEL:

DeLashmet & Marchand, P.C.
Post Office Box 2047
Mobile, AL  36652
Telephone:     (251) 433-1577
Facsimile:      (251) 433-1578

**CERTIFICATE OF SERVICE**

I hereby certify that I have on this day July 14, 2008, filed the foregoing with the Clerk of the Court using the appropriate electronic filing system, which will send notice to the following counsel of record:

William Jemison Mims
Rachael Gilmer
Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor, PA
P. O. Box 12308
Pensacola, FL  32591

Larry Givens
Cochran, Cherry, Givens, Smith, Lane & Taylor, P.C.
Post Office Box 927
Dothan, Alabama  36302


/s/ Jennifer A. Doughty
OF COUNSEL

1           IN THE U. S. DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF ALABAMA

3             SOUTHERN DIVISION

4

5   MARGARET WILLIAMS,

6       PLAINTIFF,

7    VS.           CASE NO. 1:07CV1108-MHT

8   WAL-MART STORES, INC.,
    ET AL.,

9

        DEFENDANTS.

10

11     The deposition of MARGARET WILLIAMS,

12  taken by the Defendants, pursuant to the

13  Federal Rules of Civil Procedure, before

14  Stacey Watkins, RPR, and Notary Public, State

15  at Large, at the offices of Cochran, Cherry,

16  Givens, Smith, Lane & Taylor, Dothan,

17  Alabama, on the 1st day of May, 2008, at

18  10:05 a.m., CDT, pursuant to notice.

19           *  *  *  *  *

20  APPEARANCES:

21  FOR THE PLAINTIFF:   FOR THE DEFENDANTS:

22  MR. LARRY GIVENS     MS. JENNIFER A. DOUGHTY
    Attorney at Law      Attorney at Law

23  Dothan, Alabama      Mobile, Alabama

24

25               ORIGINAL

# EXHIBIT A

1      A      No.

2      Q      I'm going to get into the accident
3   that happened at Wal-Mart.  Where were you
4   coming from on the day of your injury, March
5   11th, 2007?  What brought you to Wal-Mart, I
6   should say?

7      A      We went to eat at a -- we had just
8   come from church, and went to eat, and
9   decided we would go by Wal-Mart for just --
10   my sister had to pick up something, and went
11   in ahead of me.  And I decided I needed to
12   get a gallon of milk, so I went in.

13      Q      And what is your sister's name?

14      A      Marie Strickland.

15      Q      How far is the Wal-Mart located
16   from, first of all, the church where you were
17   coming from?

18      A      Probably ten miles.  Eight to ten
19   miles.  Something like that.

20      Q      Okay.  And is your home close by,
21   as well?

22      A      Yes, it is.

23      Q      Was anybody else with you that day
24   when you came from church and went to eat,
25   and then, went to Wal-Mart?

1    further distance?

2         A    Possibly from that chair at the end

3    over there to that chair -- the second chair

4    over there.

5         Q    So, I would say that's

6    approximately seven to eight feet?

7         A    Right.  Something like that.

8         Q    And you had a -- was it just one

9    bag of milk?

10        A    Right.  It was, yes.

11        Q    No other items?

12        A    No other.

13        Q    Okay.  And then, what happened at

14   that point?

15        A    I slipped.  My foot shot out from

16   under me, and down I went.

17        Q    Your right foot or your left foot?

18        A    My right foot.

19        Q    And then, did you fall onto your

20   side?

21        A    I fell onto my back, if I'm -- no.

22   I'm not sure.  I'm not sure, because --

23        Q    Did you fall forward or did you

24   fall backward?

25        A    Forward.

1      Q    We were just off the record and had

2    a discussion to clarify body position.  So,

3    do you recall, then, your right foot slipping

4    out in front of you, that caused your back

5    and head to go backwards --

6      A    Yes.

7      Q    -- the opposite direction of your

8    feet?

9      A    Yes.

10      Q    Okay.  Did you see what you slipped

11    on?

12      A    No.

13      Q    So, as you were walking out, you

14    did not see anything on the floor in front of

15    you?

16      A    No.

17      Q    Do you have any idea if anybody

18    else saw anything on the floor?

19         MR. GIVENS:  Before or after she

20             fell?

21         MS. DOUGHTY:  Prior to her fall.

22      A    That's before?

23      Q    Yes.  Before your fall.

24      A    No.

25         MR. GIVENS:  And by "anybody else,"

1          do we mean anybody else in the

2          whole store, or do we mean,

3          like, her sister?

4          MS. DOUGHTY:  I'm going to get into

5          that.

6          MR. GIVENS:  Go ahead.  I'm sorry.

7          MS. DOUGHTY:  That's okay.

8      Q    Was your sister walking beside you,

9  in front of you, behind you?  Do you happen

10  to recall where she was?

11     A    She had already checked out and had

12  exited the store.

13     Q    So, she was outside the vicinity of

14  the store?

15     A    Yes.

16     Q    Had left the exit door --

17     A    Right.

18     Q    -- and was outside, essentially in

19  the parking lot?

20     A    Yes.

21     Q    Do you know if any Wal-Mart

22  employees saw your fall as it happened?

23     A    I'm not sure.

24     Q    Okay.  Do you know if any Wal-Mart

25  employees saw anything on the floor prior to

1    your fall?

2         A    No.  I'm not -- no.

3              MR. GIVENS:  No, you don't know,

4                   or, no, they didn't see it?

5         A    No, I don't know if they saw

6    anything.

7         Q    After your fall, did you see what

8    you --

9         A    No.

10        Q    -- maybe slipped on?

11        A    No.

12        Q    You didn't see any substance of any

13   kind on the floor?

14        A    No.  I was just told at the store,

15   while I was in the store.

16        Q    And what were you told at the

17   store?

18        A    I was told that there was water

19   there and a skid mark there, a red skid mark.

20        Q    Do you recall who told you that?

21        A    They were talking about it in the

22   store, the store owners.  People were taking

23   pictures.

24        Q    And where were you at the time they

25   were talking about that?

1    were you from where this, as you said, skid

2    mark was after the paramedic moved you?

3         A    Let me clarify one thing.

4         Q    Okay.

5         A    When I said he moved me, I don't

6    mean he moved me from this spot to this spot.

7    He moved -- he just straightened me, like

8    that, a little bit, and he took -- somehow or

9    another, he moved my leg, that was broke and

10   everything, and it relieved some of the

11   pressure that I had from the break and

12   everything, and I thanked him for that.

13        But, now, as far as the spot, where the

14   stuff was at from me, I don't know, because I

15   couldn't see it.  You know.  I didn't even

16   try to look.  I was hurting too bad.

17        Q    Right.  So, you never saw anything

18   on the floor?

19        A    No.

20        Q    And you did not see the skid mark?

21        A    No.

22        Q    You mentioned, of course, that you

23   broke -- was it your femur or your hip?

24        A    My femur.  But I was told that I

25   had a hip fracture.

```
 1          Q      Towards the exit door, I should
 2      say.
 3          A      Yes.
 4          Q      Okay.  But you never saw anything
 5      on the floor --
 6          A      No.
 7          Q      -- prior to the time you fell?
 8          A      No.
 9          Q      After you fell, did you notice that
10      your clothes had any substance or anything on
11      them?
12          A      No.
13          Q      Your shoes?  Did you notice
14      anything on the bottom of your shoes?
15          A      No.  That wasn't what I was
16      thinking about or looking at.
17          Q      I understand.  Are you able to get
18      around okay now?  Are you able to do all your
19      usual daily activities?
20          A      Yes.
21          Q      So, since the time you were
22      released from treatment, you've been able to
23      do everything you've wanted to do?  You go to
24      the grocery store?
25          A      Yes.
```

1       Q    Because you didn't know.  And you

2  never saw anything on the floor?

3       A    No.

4       Q    So, you never saw anything on the

5  floor, and if there was something there, you

6  don't know how long it had been there?

7       A    No.

8       Q    Do you know whether any Wal-Mart

9  employees saw anything on the floor?

10      A    No, I don't.

11      Q    Do you know if they knew how long

12  anything had been there, if anything?

13      A    No.

14      MS. DOUGHTY:  Okay.  That's all I

15           have for you today.  Thank you.

16      THE WITNESS:  Thank you.

17

18          END OF DEPOSITION

19

20

21

22

23

24

25

```
 1              IN THE U. S. DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                   SOUTHERN DIVISION

 4

 5    MARGARET WILLIAMS,

 6         PLAINTIFF,

 7      VS.              CASE NO. 1:07CV1108-MHT

 8    WAL-MART STORES, INC.,
      ET AL.,
 9
           DEFENDANTS.
10

11         The deposition of MARIE STRICKLAND,

12    taken by the Defendants, pursuant to the

13    Federal Rules of Civil Procedure, before

14    Stacey Watkins, RPR, and Notary Public, State

15    at Large, at the offices of Cochran, Cherry,

16    Givens, Smith, Lane & Taylor, Dothan,

17    Alabama, on the 1st day of May, 2008, at

18    11:00 a.m., CDT, pursuant to notice.

19                    *  *  *  *  *

20    APPEARANCES:

21    FOR THE PLAINTIFF:     FOR THE DEFENDANTS:

22    MR. LARRY GIVENS       MS. JENNIFER A. DOUGHTY
      Attorney at Law        Attorney at Law
23    Dothan, Alabama        Mobile, Alabama

24
      ALSO PRESENT:                    ORIGINAL
25
      MARGARET WILLIAMS
```

# EXHIBIT B

```
1          Q     Were you already in your car?

2          A     No.

3          Q     You were heading toward your car?

4          A     Yes.

5          Q     And then, how did you learn that

6    Mrs. Williams needed you?

7          A     A lady yelled for me, asked if I

8    was Marie, and said my sister had fallen and

9    was calling for me.

10         Q     So, at that time, you went back

11   into the store --

12         A     Yes.

13         Q     -- and helped her?

14         A     Yes.

15         Q     Where did you see your sister at

16   that time?  Where was she?

17         A     On the floor.

18         Q     What did she say to you of what had

19   happened?

20         A     She said that she slipped and she

21   hurt her leg.

22         Q     Did you see anything on the floor?

23         A     Yes, I did.

24         Q     What did you see?

25         A     I saw a puddle of water, and I saw
```

```
1    a red skid mark.

2         Q      How big was the puddle of water,

3    approximately?

4         A      Approximately about three quarters

5    of the size of that machine right there.

6         Q      Okay.  So, I would say

7    approximately six inches?

8         A      Yes, I guess.

9         Q      Was it a streak of six inches?  Was

10   it a round circle?  Six inches diameter?

11        A      It was just a puddle of water.

12        Q      Okay.  A puddle.  So, there was a

13   lot of it, you're saying, or was it drops or

14   droplets?

15        A      No.  There was a lot of it.  I

16   mean, it was a puddle of water.

17        Q      About how far from Mrs. Williams

18   was this puddle?

19        A      Right at her.

20        Q      Right at her.

21        A      Real close to her.  Within inches.

22        Q      Within inches.  Do you recall if it

23   was within inches of her feet?  Within inches

24   of her hip?  I'm just trying to determine the

25   relation -- you know, you're saying inches.
```

1      A    Well, there was a paramedic from --

2    I think he was, like, from Slocomb.  He came

3    in to help Margaret.  And our pastor of our

4    church and his wife came in.  When they saw

5    me run back to Wal-Mart, they came in.

6      Q    You said the pastor?

7      A    Our pastor.  Yes.

8      Q    Who happened to be at Wal-Mart at

9    the same time?

10     A    Yes.  And I guess the manager at

11   Wal-Mart.  There was a man, a woman.  There

12   was a lady -- woman from Wal-Mart taking

13   pictures.  And there was a lady that had seen

14   the accident.  I don't remember her name.

15   She was there.  There was a crowd of people.

16   That's all I remember.

17     Q    Okay.  Did you talk to any of the

18   Wal-Mart employees?

19     A    The lady with the clipboard.  Yes,

20   I talked with her.

21     Q    You provided a statement?

22     A    Yes.

23     Q    You had exited the store just

24   within moments of your sister?

25     A    Yes.

1        Q    Did you see anything on the floor

2  at that time?

3        A    No, I didn't.

4        Q    Do you recall how busy the store

5  was that day?  A lot of people checking out,

6  exiting?  Did you have to wait in line to

7  purchase your items?  Do you have any

8  recollection?

9        A    I don't think we waited a

10  particularly long time.  I don't recall it

11  being overly crowded.

12        Q    Okay.  Have you lived next door to

13  your sister for a long time?

14        A    Since 2002, I think.

15              (Brief off-record.)

16        Q    So, you've lived near your sister

17  since 2002?

18        A    Yes.

19        Q    Did you all live close together

20  prior to that?

21        A    No.

22        Q    What brought you all to the same

23  street?

24        A    Well, my husband and I owned some

25  property at Lake Victor, and when he retired,

1    A    Yes.

2    Q    Running errands?

3    A    Yes.

4    Q    Helping out.  You said that you

5    didn't see anything on the floor when you

6    exited, and you saw the puddle of water

7    afterwards, when you came in to see your

8    sister?

9    A    (Witness nodding head in

10   affirmative.)

11   Q    Did you see anything else around

12   the area where she fell?

13   A    There was a refrigerator

14   compartment where they kept milk and stuff

15   there, and a barrel where they, I guess,

16   stored plastic -- you know, recyclable

17   plastic bags.

18   Q    That was to -- if you were walking

19   out of the store, to your left?

20   A    To my left, yes.

21   Q    Do you have any idea where the

22   water came from that you saw?

23   A    No, I don't.

24   Q    Was there a trail of it from

25   anywhere, or was it just an isolated, as you

1    explained, puddle?

2         A    As far as I know, just a puddle

3    there.  I was down on the floor by Margaret,

4    and I guess that's when I noticed it.

5         Q    Okay.  Did you see any track marks

6    through it?

7         A    No, I didn't.

8         Q    It was a clear puddle of water?

9         A    It looked clear, yes.

10        Q    Do you know if any Wal-Mart

11   employees saw that puddle shortly after your

12   sister fell?

13        A    Yes.  I do know that.  Yes.

14        Q    How do you know that?

15        A    Because we pointed it out, and they

16   saw it.

17        Q    Okay.  "They" being the person who

18   had the clipboard --

19        A    Yes.

20        Q    -- and the person that was taking

21   pictures?

22        A    Yes.

23        Q    Do you know if they knew if it had

24   been there very long?

25        A    I don't know.

```
 1              IN THE U. S. DISTRICT COURT

 2            MIDDLE DISTRICT OF ALABAMA

 3                 SOUTHERN DIVISION

 4

 5    MARGARET WILLIAMS,

 6         PLAINTIFF,

 7       VS.                    CASE NO. 1:07CV1108-MHT

 8    WAL-MART STORES, INC.,

 9         DEFENDANT.

10

11       The deposition of PHILLIP WOOD, taken

12    by the Plaintiff, pursuant to the Federal

13    Rules of Civil Procedure, before Stacey

14    Watkins, RPR, and Notary Public, State at

15    Large, at the Geneva County Courthouse,

16    Geneva, Alabama, on the 28th day of May,

17    2008, at 10:35 a.m., CDT, pursuant to notice.

18

19                  *  *  *  *  *

20    APPEARANCES:

21    FOR THE PLAINTIFF:      FOR THE DEFENDANT:

22    MR. LARRY GIVENS        MS. JENNIFER A. DOUGHTY
      Attorney at Law         Attorney at Law
23    Dothan, Alabama         Mobile, Alabama

24

25
```

COPY

EXHIBIT C

1    Correct?

2        A    Correct.

3        Q    What were you told in your training

4    with regard to situations which could

5    potentially lead to a customer having a fall

6    in the store?

7        A    What was I told?

8        Q    Yes, sir.  What was your training

9    in that area?

10       A    That we should prevent slip, trip,

11   fall accidents on a -- usually, I think it's

12   within a two-hour period every day, we do a

13   walk of the store.

14       Q    And when you say "we," who are you

15   referring to?

16       A    Management.

17       Q    So, as part of your duties as a

18   manager, you're expected to walk the store at

19   least once every two hours?

20       A    At least that.  With us, in Geneva,

21   we're on the floor more than that.

22       Q    And what is the purpose of that

23   walk-through?

24       A    To look for things that associates

25   need to be doing, looking for safety issues

1    the store, regardless of whatever reason

2    you're going from point "A" to point "B"

3    within the store, do you kind of make it a

4    habit of monitoring the floor and everything

5    to look for those sorts of potential hazards?

6        A    Yes, sir.  It's just part of our

7    duties.

8        Q    And I gather, when you do spot

9    something -- the young lady we deposed

10   earlier this morning referred to something as

11   a code 80.  Does that have a meaning to you?

12   What does that mean?

13       A    Code 80 is the cart pusher during

14   the day, and in the evening time, it's the

15   maintenance person.  And they both -- their

16   job is to take care of carry-outs,

17   maintenance with the bathrooms, sweeps

18   through the store, and mop spills and so

19   forth like that, to come and take care of

20   that.

21       Q    So, if a spill is enough that it

22   can't be wiped up, like, with a paper towel

23   or something --

24       A    We call for --

25       Q    -- you would call for the mop and

```
 1          A     Correct.

 2          Q     What is she over?  What part of the

 3     store?

 4          A     She's over the front end, and, at

 5     that time, was over soft lines, which would

 6     be apparel.

 7          Q     Did you look to see what caused Ms.

 8     Williams to fall or if there was something on

 9     the floor that caused her to fall?

10          A     I didn't find anything on the floor

11     that would have caused her to fall.

12          Q     But you made an affirmative effort

13     to look for something?

14          A     Yes, sir.  I felt of the floor and

15     took pictures of the floor.

16          Q     But, in your judgment, you didn't

17     see anything that would have caused her to

18     fall?

19          A     No.

20          Q     Did you see anything at all?

21          A     Nothing.

22          Q     Any kind of liquid?  Any kind of

23     anything?

24          A     Nothing.

25          Q     As far as you could tell, the floor
```

1    was dry?

2         A     Correct.

3         Q     Did you actually get down on the

4    floor and feel of it, or did you just do it

5    from visual observation?

6         A     I actually touched it.

7         Q     And what areas did you feel of?

8         A     Close to where her feet were

9    laying, and then, back away from it a couple

10   of tiles.

11        Q     I suspect you did not actually feel

12   under where Ms. Williams was lying, did you?

13        A     No, sir.  She was on the carpet.

14        Q     How much of her body was on the

15   carpet?

16        A     Almost all of it.  Her feet were

17   just barely onto the tile.  I think that's in

18   one of the photos.

19        Q     Which way was her head?

20        A     Her head was at the door.

21        Q     So, her head was toward the door,

22   and her feet would have, therefore, been

23   toward the two freezers that are there close

24   to the --

25        A     Pointed, I guess --

1    remember what was being said.

2        Q    Did you speak to Ms. Williams?

3        A    No, sir.

4        Q    Did you hear anybody else say

5    anything about how the event occurred?

6        A    All I heard was Debbie telling me

7    that they claimed that they had slipped on

8    some water.  And I could not find water on

9    the floor.

10        Q    Did you see any indication that Ms.

11    Williams had made a purchase while she was in

12    the Wal-Mart?

13        A    She had a gallon of milk in her --

14    or there was a gallon of milk sitting beside

15    her, on the floor, in a bag.

16        Q    And it was still in the bag when

17    you saw it?

18        A    Yes, sir.

19        Q    Do you know of any witnesses to the

20    event other than -- I think we talked with

21    one cashier this morning.  Do you know of any

22    other witnesses?

23        A    No, sir.

24        Q    Do you know of a Stephanie, it

25    looks like, Edelstein?

1      Q      But you didn't complete that --

2      A      No, sir.

3      Q      -- particular form yourself?

4      A      No, sir.

5      Q      Have you completed similar forms

6    for other events over the years?

7      A      Yes, sir.

8      Q      All right.  Thank you.  This

9    particular form, there's a question as to

10   whether or not the surface was dry.  And it

11   says "No."  And the description given on this

12   particular form is "Drops of water."  But, as

13   I understand it, you would disagree with

14   that?

15     A      I disagree with that.  Yes, sir.

16     Q      And Debbie Elmore filled this out,

17   to your understanding.  Okay.  I see where it

18   says associate entering claim into the

19   incident reporting system's name is Deborah

20   Elmore.  She was the assistant manager you

21   referred to earlier?

22     A      Yes, sir.

23     Q      Did she ask you about what you

24   observed on the floor?

25     A      She asked me did I see any water on

1    the floor, and I told her "No."

2        Q    As I understand your earlier

3    testimony, you did not check under where Ms.

4    Williams was lying.  You obviously did not

5    disturb her and try and feel up under where

6    she was.  But I also understood you to say

7    that the majority of her body was actually on

8    the rug as opposed to the tile floor?  Is

9    that right?

10        A    Correct.  She was on -- most of her

11   body was on the carpet.

12        Q    I want to show you what has earlier

13   been labeled Plaintiff's Exhibits 1 through

14   6, and ask you to identify those, if you

15   would?

16        A    On Exhibit 1, this would be

17   actually taken after she was removed from the

18   area.

19        Q    Okay.  Do you have any idea what

20   that red streak on the floor is?

21        A    That is probably from the barrel

22   that was in the corner just over there,

23   'cause it was red at the time.  The bottom of

24   it is still red.

25        Q    Okay.  Go ahead.

```
 1        Q    And there's a little discoloration

 2   in the middle of this shot.  Any idea what

 3   that is?

 4        A    No, sir.

 5        Q    Did you feel for any liquid around

 6   this area?

 7        A    Yes, sir, I did.

 8        Q    And I gather you didn't find any?

 9        A    I did not find anything.

10             MR. GIVENS:  Okay.  I'm done.

11             MS. DOUGHTY:  No questions.

12             (Plaintiff's Exhibits 1 through 6

13              are attached to the deposition of

14              Annie Newman.)

15


16                 END OF DEPOSITION

17

18

19

20

21

22

23

24

25
```

```
 1              IN THE U. S. DISTRICT COURT

 2              MIDDLE DISTRICT OF ALABAMA

 3                  SOUTHERN DIVISION

 4

 5    MARGARET WILLIAMS,

 6        PLAINTIFF,

 7      VS.                   CASE NO. 1:07CV1108-MHT

 8    WAL-MART STORES, INC.,

 9        DEFENDANT.

10

11        The deposition of DEBORAH ELMORE, taken

12    by the Plaintiff, pursuant to the Federal

13    Rules of Civil Procedure, before Stacey

14    Watkins, RPR, and Notary Public, State at

15    Large, at the Geneva County Courthouse,

16    Geneva, Alabama, on the 28th day of May,

17    2008, at 12:30 p.m., CDT, pursuant to notice.

18

19                  * * * * *

20    APPEARANCES:

21    FOR THE PLAINTIFF:      FOR THE DEFENDANT:

22    MR. LARRY GIVENS        MS. JENNIFER A. DOUGHTY
      Attorney at Law         Attorney at Law
23    Dothan, Alabama         Mobile, Alabama

24

25                                    COPY
```

# EXHIBIT D

1    So, her sister proceeded to tell me the rest

2    of the information that I wrote down on the

3    form.

4         Q    Do you remember what that

5    information was?  I know you got name,

6    address, things of that nature.  Do you

7    remember anything else?

8         A    I got name, address, telephone

9    number, basically what had happened.  It was

10   just a short statement.  About that time, the

11   rescue squad arrived.  The form was complete

12   as far as what --

13        Q    What you could do?

14        A    -- had basically happened.  And

15   that was it.

16        Q    Did you look around on the floor to

17   try and determine a cause for Ms. Williams

18   having fallen?

19        A    Yes.  I did observe the floor.

20        Q    And what did you observe?

21        A    Absolutely nothing.  It was dry.

22   There was no debris.  There was no sand.

23   There was no water.  There was nothing.

24        Q    No nothing?

25        A    No nothing.

1    states.  She stated there was drops of water

2    on the floor.  That's what I put on there.

3         Q    Okay.  But, based on your

4    observation, you never did find anything on

5    the floor?

6         A    No.

7         Q    And if the sister testified in this

8    case that there was a puddle of water, you

9    would simply disagree with that?

10        A    That is true.

11        Q    Is it possible to see the area

12   where Ms. Williams fell if one is a cashier?

13   In other words, can you basically just turn

14   your head and see the area where she fell?

15        A    Depending on what register you're

16   on, yes.

17        Q    Which registers would you expect

18   someone would be able to see that area from?

19        A    7, 8, 5 and 6, possibly 3 and 4.

20   They're all just, like, right there.

21        Q    As part of your duties as front end

22   assistant manager, did you supervise the

23   cashiers?

24        A    Yes.

25        Q    What are expected of the cashiers

1   in terms of job duties and things that

2   Wal-Mart expects them to do?

3       A    Their number one job, of course, is

4   to check people out as fast and efficiently

5   and friendly as possible.  And number two is

6   to keep a check on the front end for any

7   safety hazards, take care of the customers.

8   In the event that something does happen, stay

9   with that customer.  Guard a spill.  Clean it

10   up, if possible.  If not, call maintenance.

11   And inform management of any issues on the

12   front end.  All of that is part of their job.

13       Q    So, they're affirmatively taught to

14   look out for spills or hazards that could

15   present a safety threat to the customers?

16       A    Yes.

17       Q    Have you ever known of those two

18   coolers that are in that front end area to

19   leak?

20       A    Not to my knowledge.

21       Q    Have you ever known of them to

22   require maintenance?

23       A    Certainly.

24       Q    Who does the maintenance on those?

25       A    Dairy Fresh.

1    Q    And who would contact Dairy Fresh

2    if they were in need of maintenance?

3    A    Any member of management can do

4    that.

5    Q    Do you know of any maintenance that

6    was done on those coolers within, say, the

7    30-day period prior to when Ms. Williams

8    fell?

9    A    Not to my knowledge.

10    Q    What about 30 days after?

11    A    Not to my knowledge.

12    MS. DOUGHTY:  Object to form.

13    Q    Was there any cleanup done of that

14    area after Ms. Williams was transported?

15    A    No.

16    Q    Do you know -- I'm having trouble

17    reading it -- Stephanie -- I think it's --

18    can you read that last name?  Did you take

19    that statement that I'm handing you a copy

20    of?

21    A    Yes.

22    Q    Can you read that name for me?

23    A    Looks like Edelstein to me.  I'm

24    not sure.

25    Q    Me, too.  I suspect I can call the

1    But the doors were open for the general

2    public to come in and do business?  Correct?

3         A    The doors were open for business.

4         Q    And she had, in fact, made a

5    purchase, to your understanding, of a gallon

6    of milk?

7         A    To my understanding.

8         Q    And if the evidence in this case

9    indicates that she had a broken leg on Sunday

10   afternoon, do you have any indication that

11   she brought that broken leg into the store

12   with her when she came in?

13        A    No.

14        Q    Okay.  So, you don't have any

15   evidence or argument that she broke her leg

16   in the fall -- correct? -- to contradict

17   that?

18        A    No.

19        Q    Is it generally Wal-Mart's practice

20   to have its employees monitor the condition

21   of the floors on an ongoing basis?  In other

22   words, when you're traveling around the

23   store, going from point "A" to point "B," do

24   you tend to make it a practice to kind of

25   watch the floors and make sure there's

1    nothing there that a customer could slip on

2    and get hurt?

3        A    Certainly.

4        Q    And that's something that y'all

5    have basically been trained to do?   Correct?

6        A    Yes.

7        Q    And would that be true of the

8    cashiers, as well?

9        A    Yes, it would.

10       Q    Basically, anybody that's wearing

11   that name tag that you have on, the Wal-Mart

12   name tag, when they put that on, they've

13   already been instructed, when you're going

14   around the store, let's watch the floors and

15   try and keep them safe?

16       A    That's true.

17       Q    And just so I'm clear on this point

18   -- again, bear with me if I'm repetitive.

19   Based on your personal observations, you

20   didn't see anything on that floor that would

21   have accounted for Ms. Williams' fall?

22       A    I saw nothing.

23       Q    Let me get you to look at some

24   photographs real quick.   My understanding is

25   that Mr. Wood took the photographs?

1              IN THE U. S. DISTRICT COURT

2             MIDDLE DISTRICT OF ALABAMA

3                 SOUTHERN DIVISION

4

5    MARGARET WILLIAMS,

6         PLAINTIFF,

7       VS.              CASE NO. 1:07CV1108-MHT

8    WAL-MART STORES, INC.,

9         DEFENDANT.

10

11        The deposition of LAURA LAVALLE, taken

12   by the Plaintiff, pursuant to the Federal

13   Rules of Civil Procedure, before Stacey

14   Watkins, RPR, and Notary Public, State at

15   Large, at the Geneva County Courthouse,

16   Geneva, Alabama, on the 28th day of May,

17   2008, at 1:45 p.m., CDT, pursuant to notice.

18

19                 *  *  *  *  *

20   APPEARANCES:

21   FOR THE PLAINTIFF:     FOR THE DEFENDANT:

22   MR. LARRY GIVENS       MS. JENNIFER A. DOUGHTY
     Attorney at Law        Attorney at Law
23   Dothan, Alabama        Mobile, Alabama

24

25                                 COPY

1    policing this area to make sure there's

2    nothing there that a customer could slip and

3    fall on?

4        A    Yes, sir.

5        Q    Is that something y'all are trained

6    to do from the get-go?

7        A    Yes, sir.

8        Q    When you go from one area of the

9    store to another, are you kind of watching

10    the floors, looking out for such as that?

11        A    Yes, sir.

12        Q    Is that something they train you to

13    do, and you kind of get to where it's a

14    habit?

15        A    Yes, sir.

16        Q    Was there a "Wet floor" sign out

17    where Ms. Williams fell?

18        A    Not to my knowledge.

19        (Whereupon, Plaintiff's Exhibit 9

20         marked for identification.)

21        MR. GIVENS:  We're going to make

22          the drawing that you were kind

23          enough to do for us Plaintiff's

24          Exhibit 9.  And one thing I

25          want to put on record, for the

1    Q    Don't know, one way or the other?

2    A    No, sir.

3    Q    You didn't make any observations or

4    any investigation yourself to ascertain

5    whether or not the floor was wet or dry?

6    A    Not afterwards, no, sir.

7    Q    You didn't see any drops of water,

8    then, it would be safe to say?

9    A    I didn't.

10    Q    Did you notice what kind of shoes

11    Ms. Williams had on?

12    A    Dress shoes.

13    Q    Was she dressed as though she might

14    have been coming from church?

15    A    Yes, sir.

16    Q    And this was a Sunday afternoon,

17    wasn't it?

18    A    Yes, sir.

19    Q    And she was dressed up?

20    A    Yes, sir.

21    Q    Did you see any indication that Ms.

22    Williams had made a purchase in the store?

23    A    Milk, I believe it was.

24    Q    What did you see in regard to milk?

25    A    What did I see?

1              IN THE U. S. DISTRICT COURT

2              MIDDLE DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5    MARGARET WILLIAMS,

6          PLAINTIFF,

7       VS.                    CASE NO. 1:07CV1108-MHT

8    WAL-MART STORES, INC.,

9          DEFENDANT.

10

11       The deposition of ANNIE C. NEWMAN,

12   taken by the Plaintiff, pursuant to the

13   Federal Rules of Civil Procedure, before

14   Stacey Watkins, RPR, and Notary Public, State

15   at Large, at the Geneva County Courthouse,

16   Geneva, Alabama, on the 28th day of May,

17   2008, at 9:00 a.m., CDT, pursuant to notice.

18

19                    * * * * *

20   APPEARANCES:

21   FOR THE PLAINTIFF:     FOR THE DEFENDANT:

22   MR. LARRY GIVENS       MS. JENNIFER A. DOUGHTY
     Attorney at Law        Attorney at Law
23   Dothan, Alabama        Mobile, Alabama

24

25                              COPY

EXHIBIT F

1       A    The part where I was checking out.

2   My cash register, around my register.

3       Q    Was part of your responsibility to

4   observe the area between the cash registers

5   and exit door, as well?

6       A    We observe all of it --

7       Q    All around?

8       A    -- as we walk, just going back and

9   forth, helping customers, pushing buggies up.

10      Q    Were you ever told during your

11  training to monitor the floors, to look out

12  for something that a customer could slip on?

13      A    Yes, sir.

14      Q    And do you recall monitoring the

15  floor to look out for something that a

16  customer could slip on prior to Ms. Williams

17  falling on that Sunday?

18      A    Yes, sir.  We're constantly going

19  through, checking everything, making sure

20  nothing is slippery, nothing is in the floor,

21  no trash.

22      Q    No liquids or anything like that?

23      A    No nothing on the floor.

24      Q    And you did that on the occasion

25  prior to the time Ms. Williams fell?

1        A    When we don't have customers,

2    that's exactly what we do.  We walk the

3    floor.

4        Q    And you didn't observe anything --

5        A    No, sir.

6        Q    -- that she could have fallen on?

7        A    No, sir.

8        Q    And, as we sit here today, you

9    still have no knowledge what did --

10        A    No, sir.

11        Q    Assuming there was something there

12    that caused her to slip and fall, you don't

13    know what that is as of today?

14        A    No, sir.

15        Q    You never had any conversations

16    with any Wal-Mart employees to inquire as to

17    why she fell?

18        A    No, sir.

19        Q    There are, I believe, coolers, milk

20    coolers and drink coolers, in close proximity

21    to the checkout lines at this Wal-Mart?

22    Correct?

23        A    Correct.

24        Q    And are they located today in the

25    same location they were on the day Ms.

1    area where Ms. Williams fell after she was

2    loaded onto the stretcher and taken out of

3    the store?

4         A     No, sir.

5         Q     Did you see anything in the way of

6    a cleanup effort?

7         A     No, sir.

8         Q     Did you continue to conduct your

9    duties as a cashier after she fell?

10        A     Yes, sir.

11        Q     For how long?

12        A     Until my shift was over.

13        Q     Which would have been when?

14        A     I don't recall.

15        Q     Would it have been for at least an

16   hour after she left, you think?

17        A     At least.

18        Q     If not more?

19        A     If not more.

20        Q     Have you reviewed any material in

21   preparation for this deposition?  Any written

22   material, other than -- I'm not talking about

23   conversations with Wal-Mart's attorney.  But,

24   other than that, have you reviewed any

25   material of any kind in preparation for this