# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

MARGARET WILLIAMS,       )
                                   )

    Plaintiff,            )
                                   )

v.                        )     Case No.: 1:07CV1108-MHT
                                   )

WAL-MART STORES EAST, L.P.,  )
                                   )

    Defendant.          )

## PLAINTIFF'S BRIEF IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT HERETOFORE FILED BY DEFENDANT, WAL-MART STORES EAST, L.P.

COMES NOW the plaintiff, by and through her undersigned counsel, and herewith submits her Brief in Opposition to the summary judgment motion heretofore filed by the above named defendant. As the basis for such opposition, Plaintiff states as follows:

### STATEMENT OF THE CASE

The defendant, (hereinafter referred to as Wal-Mart) included within its Brief in Support of Motion for Summary Judgment a narrative summary of facts it claims to be undisputed. Plaintiff will hereinafter illustrate that the facts of this case, whether undisputed or otherwise, lead to the conclusion that there are genuine issues of material fact which make summary judgment inappropriate.

The evidence in this case will establish that on March 11, 2007, Margaret Williams was a shopper in the Wal-Mart store located in Geneva, Alabama. After paying for her purchase, Mrs. Williams walked away from the cashier and before reaching the exit door, she fell, suffering a broken leg in the process. The evidence will establish that at least three people, Mrs. Williams' sister, Marie Strickland, the Reverend Thomas Ealum and his wife,

Eloise, observed a puddle of water where Mrs. Williams fell.  As will be noted below,

Reverend Ealom is Mrs. Williams' pastor at Mt. Olive Assembly of God Church.  The

evidence will further establish the puddle of water was in close proximity to where a number

of Wal-Mart employees carried out their duties as cashiers.  It is this latter fact which makes

this case different from the various cases cited by Wal-Mart in its brief.

## STANDARD OF REVIEW

The standard of review applicable to a summary judgment motion was well stated by Judge

Sherrill in the recent case of *Anderson v. Tyus*, 2007 WL 2884367 (N.D. Fla.).  With the

Court's kind indulgence, Plaintiffs will draw liberally from that decision:

> On a motion for summary judgment Defendants initially have
> the burden to demonstrate an absence of evidence to support
> the nonmoving party's case.  *Celotex Corporation v. Catrett,*
> 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d
> 265 (1986).  If they do so, then the burden shifts to Plaintiff
> to come forward with evidentiary material demonstrating a
> genuine issue of material fact for trial.  *Id.* An issue of fact is
> "material" if it could affect the outcome of the case.  *Hickson
> Corp. v. Northern Crossarm Co., Inc.,* 357 F.3d 1256, 1259
> (11th Cir.2004)(citations omitted).  Plaintiff must show more
> than the existence of a "metaphysical doubt" regarding the
> material facts, *Matsushita Electric Industrial Co., LTD v.
> Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct.
> 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of
> evidence is insufficient.  The court must decide "whether the
> evidence presents a sufficient disagreement to require
> submission to a jury or whether it is so one-sided that one
> party must prevail as a matter of law."  *Hickson Corp.,* 357
> F.3d at 1260, *quoting Anderson v Liberty Lobby*, 477 U.S.
> 242, 252, 106 S.Ct. 2505, 2505, 91 L.Ed.2d 202 (1986).[1]
> **All reasonable inferences must be resolved in the
> light most favorable to the nonmoving party.**  *Watkins v. Ford
> Motor Co.,* 190 F.3d 1213, 1216 (11th Cir. 1999).

---

[1] The "double" reference to page 2505 of S.Ct. 106 appears in the version of *Anderson v. Tyus* distributed
by Westlaw.  This is apparently a typographical error as a review of *Anderson v. Liberty Lobby* indicates
the subject language actually appears at page 2512.

> "Rule 56(e) … requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126, 118 S.Ct. 1074, 140 L.Ed. 133 91998), *quoting Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed. R.Civ.P. 56(c), (e)). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). *Owen v. Wille*, 117 F. 3d at 1236; *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

*Anderson* at 1, 2 (emphasis added).

A noted above, the role of the trial judge at the summary judgment stage is to determine if there are genuine issues of material fact that warrant placing the case before a jury. It is not the Court's role to act as the finder of fact, a province left to the jury should the Court determine there are issues to be tried.

## ARGUMENT

### 1. There Are Genuine Issues Of Material Fact

This case may be summarized by a two step analysis; first, was there a foreign object on the floor which caused Mrs. Williams to fall and, second, did Wal-Mart have notice of this hazard? By the following passage on page six of its brief, Wal-Mart explicitly concedes that for purposes of this summary judgment, the Court must assume there was a substance on the floor.

> While Wal-Mart maintains that there was no hazard on the floor which caused Plaintiff to fall, because the Court must view the evidence in light most favorable to the Plaintiff and assume there was a substance on the floor based on the testimony of Plaintiff's sister, there is no evidence indicating Wal-Mart knew or had notice of the substance on the floor at the time of Plaintiff's alleged slip and fall.

The foregoing concession should indeed be sufficient to establish the presence of the offending hazard, however, support for this position is not limited to the testimony of Marie Strickland. As established by their affidavits which are attached hereto as Exhibits "A" and "B" respectively, both the Reverend and Mrs. Thomas Ealum observed the water puddle alluded to by Marie Strickland in her deposition. These affidavits are made a part hereof by reference. As explained in their affidavits, the Ealums journeyed to Geneva following Sunday morning church services to have lunch and later decided to stop by the Wal-Mart store. Upon learning Mrs. Williams, a member of their congregation, had fallen and been injured, they immediately went to her side. Both unequivocally indicated they observed the puddle of water which various Wal-Mart employees maintain was never present. Both Reverend and Mrs. Ealum describe the scene as being adjacent to the check-out counters and Mrs. Ealum alludes to a number of Wal-Mart employees that continued to operate the cash registers as Mrs. Williams was tended to.[2] Mrs. Ealum indicates it is her opinion that "a cashier could easily have seen the water had they been monitoring the floor in the area."

Marie Strickland did not just indicate there was a puddle of water on the floor. She affirmatively indicated a Wal-Mart employee saw it. As is noted below, Mrs. Elmore, Wal-Mart's assistant manager who completed the incident report claims she noted the floor was wet on the report because Mrs. Strickland said as much. Questioning is by counsel for Wal-Mart:

> Q.     Do you know if any Wal-Mart employees saw that puddle shortly after your sister fell?

---

[2] This is consistent with the testimony of Wal-Mart employee Annie Newman who, when asked what her supervisor, Laura Lavalle, did after Ms. Newman notified Ms. Lavalle of Mrs. Williams' fall, indicated she "was not paying attention at that time. I was busy checking out my customers." Ms. Newman confirmed check out operations continued while Mrs. Williams was lying on the floor. (Newman Dep., p.27, lns. 17 to 25)

A.    Yes, I do know that.  Yes.

Q.    How do you know that?

A.    Because we pointed it out, and they saw it.

Q.    Okay.  "They" being the person who had the clipboard –

A.    Yes.

Q.    -- and the person that was taking pictures?

A.    Yes.

(Strickland Dep., p.18, lns.10-22)

Mrs. Williams herself offered the following testimony regarding what she heard as she lay on the floor of the Geneva Wal-Mart.  Again, questioning is by counsel for Wal-Mart.

Q.    You didn't see any substance of any kind on the floor?

A.    No.  I was just told at the store, while I was in the store.

Q.    And what were you told at the store?

A.    I was told that there was water there and a skid mark there, a red skid mark.

Q.    Do you recall who told you that?

A.    They were talking about it in the store, the store owners.  People were taking pictures.

(Williams Dep., p.18, lns. 12-23)[3]

---

[3] Mrs. Williams indicated someone mentioned a red skid mark.  In discussing the few photographs he took, Phillip Wood was asked about a red streak that appeared on Exhibit 1 (to Annie Newman's deposition – the parties by agreement used the same exhibits for all depositions and retained the common number).  Mr. Wood felt it probably came from a barrel that was near where Mrs. Williams fell.  See p.44, lns.21-24 of Wood's Dep.  Plaintiff mentions this for its strong tendency to corroborate what Mrs. Williams made reference to.  The photograph shows the red skid mark.

The following testimony is drawn from the depositions of four Wal-Mart employees. This testimony, together with the case law which will be discussed below, strongly supports Plaintiff's position that under the applicable law and facts, summary judgment is due to be denied.    And, while the Court's role in a summary judgment does not include testing credibility – that is clearly the province of the jury – plaintiff expects to provide examples of inconsistent testimony which will support the position the jury should be allowed to exercise its judgment.

The following testimony is from the deposition of Deborah Elmore, one of Wal-Mart's assistant managers who responded to Mrs. Williams' fall.    Unless otherwise indicated, all questioning is by counsel for the plaintiff.

> Q.    Did you get any additional information from someone else on her behalf?
>
> A.    Yes, I did.
>
> Q.    And from whom did you get that?
>
> A.    I believe it was her sister.
>
> Q.    Was her sister on the scene, as well?
>
> A.    Yes.
>
> Q.    What did her sister tell you?
>
> A.    She had fallen.
>
> Q.    Is that pretty much it?  Just that she had fallen?
>
> A.    That was pretty much – that's all I remember her saying.

(Elmore Dep., p.22, ln.13 to p.23, ln.1)

Mrs. Elmore again limited Mrs. Strickland's statement on page 37 of her deposition where she said Mrs. Strickland indicated Mrs. Williams "had fell down.  She was carrying a

gallon of milk, and she had slipped down. That was basically what she told me." (Elmore

Dep., p.37, ln.22). Plaintiff's counsel then inquired as to what material Mrs. Elmore

reviewed in preparation for her deposition.

> Q.    Have you reviewed any material in preparation for this deposition? Any reports, photographs, documents of any kind?
>
> A.    I did review the file, yes.
>
> Q.    What all was in the file?
>
> A.    The report, photographs, statements.
>
> Q.    When you say "the report," are you talking about this one that –
>
> A.    Yes.
>
> Q.    --we've identified as Exhibit 8?
>
> A.    Yes.
>
> Q.    That report?
>
> A.    Yes.

(Elmore Dep., p.38, ln.15 to p.39, ln.3)

The report alluded to above, and identified as Exhibit 8, is attached hereto as Exhibit

"C" which is made a part hereof by reference. In completing the report made Exhibit "C,"

Mrs. Elmore, on the day of the event indicated the surface was not dry and there were what

she described as "drops of water." Plaintiff's counsel asked about this apparent

inconsistency with Mrs. Elmore's testimony that there was nothing on the floor and received

the following explanation.

> Q.    Okay. So what we were talking about earlier, as far as a computer-generated document that you're supposed to send to CMI within 24 hours of an accident in the store, that's a hard copy of what would have been seen on a computer screen if I were looking at it?

A.     That's correct.

Q.     Let me see it just a minute.

A.     (Handing document to Mr. Givens.)

Q.     And it indicates that associate entering the claim into the incident reporting system is Deborah Elmore.

A.     Correct.

Q.     And that's you?  Correct?

A.     That's correct.

Q.     Did you do this within the 24 hours required by Wal-Mart?

A.     Yes, I did.

Q.     Did you do it that same afternoon?

A.     Yes, I did.

Q.     One of the questions that is on here is whether or not the surface was dry.  And, on this form, you've put "Drops of water."  Do you recall doing that?

A.     Yes, I do.

Q.     I understood your earlier testimony to be that the floor was dry, there was nothing on it.

A.     That's correct.

Q.     That confuses me as to an entry here where it says it's not dry and there were drops of water, and testimony that it was dry.  Kind of clarify that for me, if you would?

A.     Okay.  When we fill those forms out, we put on there what the customer states.  She stated there were drops of water on the floor.  That's what I put on there.

Q.     Okay.  But based on your observation, you never did find anything on the floor.

A.     No.

8

> Q.    And if the sister testified in this case that there was a puddle of water, you would simply disagree with that?
>
> A.    That is true.

(Elmore Dep., p.30, ln.13 to  p.32, ln.10)

At first blush, the foregoing may seem to be needless reiteration of the fact Mrs. Strickland says there was a water puddle and Wal-Mart, through its employees, says there was not.   But, it is significant that when on two occasions Mrs. Elmore was asked what she was told by Mrs. Strickland, all she could remember was that Mrs. Strickland said Mrs. Williams had fallen down with no reference to the water, whether it be drops or in the form of a puddle.   Then, when asked about exhibit "C," Mrs. Elmore's explanation for the apparent inconsistency as to whether the floor was wet or dry was based upon an assertion that Mrs. Strickland said it was wet so that is what Mrs. Elmore put on the form.  Given the fact Mrs. Elmore reviewed the form in question prior to the deposition, one might expect her to be able to recall that Mrs. Strickland had mentioned the wet floor to her at the time of the event.  Nonetheless, given two opportunities to mention this important fact, Mrs. Elmore did not do so until questioned about the inconsistent form.   This is the type of credibility question a jury is entitled to explore.  If Wal-Mart's employees are inconsistent regarding one aspect of this case, a jury should be given the opportunity to test the credibility of the remainder of their testimony, particularly as it concerns the notice issue.

With regard to the notice issue, Plaintiff again emphasizes the location of this event is critical to the Court's deliberations.  This accident did not occur on a merchandise isle in the interior portion of the store, it occurred immediately adjacent to the cash registers and checkout lanes.  (See Elmore Dep., p.26, lns 5 to 8)  As such, if, as Wal-Mart agrees, and as

strongly supported by the testimony of Marie Strickland and the affidavits of Reverend and Mrs. Ealum, the Court must assume there was water on the floor, the Court must also assume this water existed under the very eyes of a number of Wal-Mart employees. As the case law discussed below will support, notice need not be actual, it is enough that the defendant have constructive notice **or** that the jury find the store was delinquent in discovering the hazard. The following testimony is certainly relevant to this position.[4]

> Q.     What are expected of the cashiers in terms of job duties and things that Wal-Mart expects them to do?
>
> A.     Their number one job, of course, is to check people out as fast and efficiently and friendly as possible. **And number two is to keep a check on the front end for any safety hazards, take care of the customers.** In the event that something does happen, stay with the customer. Guard the spill. Clean it up, if possible. If not, call maintenance. And inform management of any issues on the front end. All of that is part of their job.
>
> Q.     So, they're affirmatively taught to look out for spills or hazards that could present a safety threat to the customers?
>
> A.     Yes.

(Elmore Dep., p.32, ln.25 to p.33, ln.16) (emphasis added)

Cashier Annie Newman provided the following testimony regarding monitoring the floor around the check-out area:

> Q.     Was part of your responsibility to observe the area between the cash registers and the exit door, as well?
>
> A.     We observe all of it –
>
> Q.     All around?

---

[4] At this juncture, Plaintiff feels it is important that the Court understand the Wal-Mart in question is a small store in a rural community, not one of the "super" stores. This store has only eight cash registers spread out over four check-out lanes. As such, in contrast to the super stores, this check out area is tightly packed and in a relatively small area. Exhibit nine (attached hereto as Exhibit "D" and made a part hereof by reference) to the deposition of Laura Lavalle shows a graphic depiction of the area and pages 16 through 19 of Annie Newman's deposition provide a verbal description of the layout.

    A.    -- as we walk, just going back and forth, helping customers, pushing buggies up.

    Q.    Were you ever told during your training to monitor the floors, to look out for something that a customer could slip on?

    A.    Yes, sir.

    Q.    And do you recall monitoring the floor to look out for something that a customer could slip on prior to Ms. Williams falling on that Sunday?

    A.    Yes, sir.  We're constantly going through, checking everything, making sure nothing is slippery, nothing is in the floor, no trash.

(Newman Dep., p.33, ln.3 to ln.21)

The applicable law regarding notice is that the defendant knew, **or should have known**, of the offending material.  Given Ms. Newman's testimony, a jury should decide whether the close proximity of a number of Wal-Mart employees to the place of the fall provided them with constructive notice, if not actual notice, of the water puddle observed by Marie Strickland as well as Reverend and Mrs. Ealum.

On the day Mrs. Williams fell, Laura Lavalle was the customer services manager. (Lavalle Dep., p.9, ln.2)   Ms. Lavalle was located at the customer service counter which is adjacent to the check-out area.  Ms. Lavalle testified she could observe the area where Mrs. Williams fell from her position at the customer service desk.  (Lavalle Dep., p.10, ln.11). Ms. Lavalle offered the following testimony regarding the number of cashiers on duty when Mrs. Williams fell.[5]

    Q.    Do you recall how many cashiers were working that day?

    A.    No, sir, it's been a while ago.

---

[5] When asked about the number of cashiers on duty at the time, Mrs. Elmore indicated "probably four. That's a guess." (Elmore Dep. p.36, ln. 19)    As someone who was assistant manager of the front end, which included the cashiers, Mrs. Elmore is certainly in a position to render an "educated" guess. (See Elmore Dep., p.7, lns.2 through19)

Q.    Sure.  My understanding is the most you're ever going to have is eight?  Correct?

A.    Right.

Q.    Because that's how many cash registers you have?

A.    Yes, sir.

Q.    So, the fewest you would ever have is one.  The most you would ever have is eight?

A.    Right.

Q.    And we know from what you've just told us and from earlier testimony today, that Annie Newman was working that day.

A.    Uh-huh.

Q.    Do you have a recollection that there were other cashiers working, as well?

A.    Yes, sir.  There were a few more.

Q.    Can you give me a range?  Four to five?  Five to six?  Somewhere in there?  Because the most we are dealing with is eight.

A.    I would say at least between three and five.

Q.    Between three and five?

A.    Yeah.

Q.    Do you, by chance, recall which cash registers were open?

A.    1, 7 and 5, definitely.

Q.    Okay.  Do you recall which cash register Annie Newman was on?

A.    5.

(Lavalle Dep., p.11, ln. 6 to p.12, ln.14)

Based upon Ms. Lavalle's testimony we know there were at least four (Ms. Lavalle and three cashiers; potentially as many as six) Wal-Mart employees in a position to see the

water puddle and to do something about it before Mrs. Williams fell.  Mrs. Elmore testified

that someone working registers 7, 8, 5 and 6 (and possibly 3 and 4) would be able to see the

area in question.  In her words, "they're all just, like, right there."  (Elmore Dep., p.32,

lns.19-20).  Ms. Lavalle testified there were "definitely" cashiers on 1, 7 and 5, the latter

being Ms. Newman who  testified she "constantly" monitored the floor pursuant to her

training.

   Mr. Phillip Wood, also an assistant manager with the Geneva Wal-Mart store at the

time Mrs. Williams fell offered the following testimony regarding the check-out area.

> Q.     I'm not talking about actually seeing her fall.  I'm talking about, as a
> general, broad scope observation, would someone working those cash
> registers be able to –
>
> A.     To tell if there was –
>
> Q.     -- be able to look at the floor?
>
> A.     Yes, they could.  'Cause they're usually either facing each other –
> usually, the cashiers are – because they're designed where, like, if someone
> comes to register 1, the person – like you're the customer.
>
> Q.     Right.
>
> A.     At register 2, you would be – the customer is at register 1, and then,
> the customer comes on the other side.  So, that person at register 2 could see
> what was going on toward the doors.
>
> Q.     And they could see the floors toward the doors?
>
> A.     Correct.
>
> Q.     Did you observe any "wet floor" signs when you walked to the front
> where Ms. Williams was?
>
> A.     There was none.

(Wood Dep., p.33, ln.22 to p.34, ln.21).[6]

Plaintiff also feels the Court should be guided in its deliberations by certain evidence which is not available. The following testimony offered by Mrs. Elmore touches on this subject.

Q.     To kind of summarize, there is a video surveillance system that existed on the day of this event?  Correct?

A.     Correct.

Q.     And that video surveillance system includes the capability of recording – not merely observing, but recording things that the camera sees? Correct?

A.     Correct.

Q.     In other words, if somebody were shoplifting, ya'll would want to have video evidence to show that that person shoplifted, as a for instance? Correct?

A.     Correct.

Q.     And if there were a cashier who, heaven forbid, was not the most honest person in Geneva County, and they put in one 20 and take out three 10's, ya'll would want to be aware of that?  Correct?

A.     That's correct.

Q.     And if, heaven forbid, somebody falls in your store, it might be a good idea to have evidence of that?  Correct?

A.     That's correct.

Q.     Now, my question is – I'm trying to get to the existence of and current status of any video evidence surrounding this event.  And I would be interested in that time frame a few minutes before the event and a few minutes after.  Okay.  And we've established, I think, that you had some conversation with Mr. Reed, who is the store manager.  Obviously, he was not there, or, to my understanding, he was not there that day.  But, when he next came in to work, he was filled in on what happened? Correct?

---

[6] Simply as an observation, Plaintiff's counsel notes Mr. Wood also alluded to "the lady that was doing the praying." at the bottom of page 34. While this observation is not pivotal, it is not unreasonable to surmise this was Eloise Ealum, the wife of Mrs. Williams' minister.

A.     That's correct.

Q.     Okay.  And you've indicated that he would have been responsible for the surveillance tape.  Is that accurate or not?

A.     Any member of management.  The bottom line is, yes.

Q.     But ya'll never watched the tape of this area in the time frame surrounding this fall?

A.     I don't recall that, no.

Q.     Do you recall ever hearing if the tape was transferred to another Wal-Mart location, to Claims management, Incorporated, or anywhere else?

A.     No.

(Elmore Dep., p. 48, ln.4, to p.50, ln.5)

Plaintiff also refers the Court to testimony given by Mrs. Elmore beginning on page 39, line 18 and continuing to page 48, line 3.  Taken with the testimony cited above, one may conclude Wal-Mart's cameras might occasionally malfunction but no indication is provided that there was a malfunction on this occasion.  Instead, Mrs. Elmore indicates she has no recollection of viewing the tape even though she was the manager on duty and she is who generated the incident report for transmission to Wal-Mart's in-house claims office.  If one does not even view the tape, how can one say it malfunctioned and, given the significance of the event, one would reasonably conclude that had an effort been made to review the tape, a malfunction would certainly have been memorable.[7]

In short, Mrs. Elmore, Wal-Mart's on duty manager, acknowledges there is video surveillance equipment for which she shares responsibility but, notwithstanding thorough and searching questioning by Plaintiff's counsel, she can offer no explanation as to what happened to this important piece of evidence.  On page 41 of her deposition, Mrs. Elmore

---

[7] On page 45 at lines 11-12, Mrs. Elmore specifically states she "would consider it (the fall) significant."

indicated there were 12 to14 cameras that monitor the area around the check-out lanes with one on each of the cash registers (that would be eight by itself). For purposes of this summary judgment motion, it would seem a marked injustice for this defendant to benefit from missing evidence which was under its sole control and for which no explanation has been offered to account for its whereabouts.

The foregoing obviously raises the specter of evidence spoliation which the plaintiff regrets but which the plaintiff cannot ignore under the facts of this case. Guidance as to this issue is found in *Flury v. Daimler Chrysler Corporation*, 427 F.3d 939 (11th Cir., 2005). Therein, while declaring the issue of spoliation an evidentiary one implicating federal law, the Court nonetheless relied upon Georgia law due to a lack of "specific guidelines" in this circuit. *Flury* at 944. The Court also noted Georgia law was in any event "wholly consistent with federal spoliation principles." *Id.* at 944. For a recent case involving spoliation as addressed by the Alabama Supreme Court, reference is made to *Vesta Fire Insurance Corporation v. Milam & Company Construction Inc.,* 901 So.2d 84 (Ala. 2004). Plaintiff particularly draws the Court's attention to the *Vesta Fire* Court's recognition of Justice Lyons' dissent from *Alabama Power v. Muray*, 751 So.2d 494, at 503-04 (Ala., 1999) which is found beginning at 97.

## 2. The Case Law Supports the Plaintiff's Position

In *Neel-Gilley v. McCallister*, 753 So.2d 531, (Ala.Civ.App., 1999), the appellate court reversed a summary judgment in favor of the defendant in a case that presents very similar facts to the case at hand. The evidence tended to show that as Ms. Neel-Gilley entered McCallister's Oyster Bar and Seafood Restaurant, she fell just as she stepped from the entrance rug to the floor. She and her companion both offered evidence there was

puddled water accumulated at that spot. Mr. McCallister and his wife both denied the presence of water. It was undisputed Ms. Neel-Gilley was a business invitee, as was Margaret Williams when she was in the Geneva Wal-Mart on March 11, 2007. Such being the case, the *Neel-Gilley* Court found the following duty was applicable.

> A storekeeper is under a duty to exercise reasonable care to provide and maintain reasonably safe premises for the use of his customers. However, the storekeeper is not an insurer of the customer's safety, and is liable for injury only if he negligently fails to use reasonable care in maintaining his premises in a reasonably safe condition. The plaintiffs must prove that the injury was proximately caused by the negligence of [the storekeeper] or one of its servants or employees. Actual or **constructive** notice of the presence of the substance must be proven before [the storekeeper] can be held responsible for the injury. Furthermore, the plaintiffs must prove (1) that the substance slipped upon had been on the floor a sufficient length of time to impute constructive notice to [the storekeeper]; or (2) that [the storekeeper] had actual notice that the substance was on the floor; or (3) **that [the storekeeper] was delinquent in not discovering and removing the substance.**

*Neel-Gilley* at 552-3 citing *Dunklin v. Winn-Dixie of Montgomery, Inc.*, 595 So.2d 463, 464 (Ala. 1992), quoting *Maddox v. K-Mart Corp.*, 565 So.2d 14, 16 (Ala. 1990) (Emphasis added)

In reversing the trial court's grant of summary judgment, the Alabama Court of Civil Appeals observed that "[w]hether water had accumulated in the entrance to the business and whether it was there for a sufficient amount of time to impute notice to the McCallisters, or whether the McCallisters were delinquent in failing to discover its presence are questions to be decided by a jury." *Id.* at 535.

The case of *Kenney v. The Kroger Company*, 569 So.2d 357 (Ala. 1990) is also instructive. The *Kenney* Court alluded to the three factors replied upon in the *Neel-Gilley* decision; that is (1) sufficient time to impute constructive notice, *or* (2) actual notice, *or* (3)

that the defendant was delinquent in not finding and removing the substance.  *See Kenney* at 358.  Plaintiff wishes to emphasize the requirement of proof is not in the conjunctive. Plaintiff need only establish one of the three requirements listed above.   In reversing summary judgment, the *Kenney* Court noted there was evidence that a large amount of Pine-Sol had accumulated.   Herein, Mrs. Strickland alluded to a puddle of water that was approximately six inches across.  Beyond that, the Court is again asked to remember that Mrs. Williams fall took place at the check-out area in close proximity to a number of Wal-Mart employees.  The plaintiff in *Kenney* was located in a merchandise isle but the Court still reversed summary judgment.  Plaintiff respectfully submits the facts herein are even more compelling that those found in *Neel-Gilley* and *Kenney*.

Wrriting for the Court in *Williams v.Bruno's Inc.*, 632 So.2d 19 (Ala. 1993), Justice Almon noted "that in a negligence action against a shopkeeper questions of notice are properly left to the jury."  *Williams* at 21.  (Concurrence by Justices Maddox, Kennedy, Cook and C.J. Hornsby).  *Williams* provides excellent insight into the Court's premises liability analysis and the ability of a jury to infer facts from the evidence provided.   The *Williams* Court noted a jury could find notice as to certain strips (where it believed the plaintiff's version of the facts) "because one might reasonably infer that the strips were placed there by an employee of that Food World store."  *Id.* at 22.  Likewise, in the case at hand, a jury would be free to infer the water came from the near-by coolers, notwithstanding Wal-Mart's denials that that was the source of the water.[8]  Naturally, Wal-Mart would have to deny that was the source since they deny there was ever any water to begin with.

---

[8] For testimony regarding the coolers, the Court may refer to Mr. Wood's deposition beginning at page29, line 10 and continuing to page 30, line 22.

Case 1:07-cv-01108-MHT-TFM    Document 28    Filed 08/04/2008    Page 19 of 26

The *Williams* case is also instructive because an employee of one of the defendants was in close proximity to the plaintiff when he fell. In that context, the Court indicated "one could reasonably infer that Light saw or should have seen the kick plate protruding from the shelf before Williams' fall…" *Williams* at 21. Light, the employee of the defendant cleaning company, testified he had been up and down the isle but had not noticed the kick plate being out of place. Similarly, even though Wal-Mart's employees claim to have constantly monitored the check-out area and claim there was no water after Mrs. Williams fell, one could reasonably infer that since there is substantial evidence the water was there, the employees did not monitor the area as they testified.

**SUMMARY**

The defendant concedes there is a genuine issue of material fact regarding the presence of water where Margaret Williams fell. This concession is inevitable given the weight of the evidence. Though no such concession is made as to the issue of notice, the great weight of the evidence suggests there should have been. Multiple Wal-Mart employees were on the spot but they were not attentive. A jury is due to answer the question whether Wal-Mart, through its employees, was delinquent is spotting a hazard. There are genuine issues of material fact as to all elements of the plaintiff's claim.[9] Summary judgment is due to be denied.

WHEREFORE, the premises considered, Plaintiff respectfully request this Honorable Court DENY the summary judgment motion filed by Defendant, Wal-Mart.

---

[9] Wal-Mart has made no assertion Mrs. Williams was not injured during her fall. As such, Plaintiff has not addressed the element of damages. An issue not raised need not be confronted.

19

Dated:  August 4, 2008

COCHRAN, CHERRY, GIVENS,
SMITH, LANE & TAYLOR, P.C.

/s/ Larry Givens
Larry Givens(Giv012)
ASB No: ASB-9077-N50L
P. O. Box 927
Dothan, AL  36302
(334) 793-1555 – Phone
(334) 836-2500 – Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2008, I electronically filed the foregoing Plaintiff's Brief In Opposition to Defendant's Motion For Summary Judgment with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to:

W. Pemble DeLashmet
DeLashmet & Marchand, P.C.
P.O. Box 2047
Mobile, AL  36652
wpd@delmar-law.com

Jennifer Allen Doughty
DeLashmet & Marchand, P.C.
jad@delmar-law.com

Chad Christopher Marchand
DeLashmet & Marchand, P.C.
ccm@delmar-law.com

/s/ Larry Givens
LARRY GIVENS

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

MARGARET WILLIAMS,                    )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        Case No.: 1:07CV1108-MHT
                                      )
WAL-MART STORES EAST, L.P.,           )
et al.                                )
                                      )
        Defendant.                    )

### AFFIDAVIT OF ELOISE S. EALUM

STATE OF FLORIDA:
COUNTY OF HOLMES:

        Before me, the undersigned authority, personally appeared Eloise S. Ealum who
after being by me first duly sworn, did depose and state:

        1.      My name is ELOISE S. EALUM and I am over the age of twenty-one (21).
I am in no way disqualified from providing the following sworn statement and I do so based
upon my own personal knowledge of the matters stated herein.

        2.      I am a resident citizen of Holmes County, Florida and reside at 1657
Highway 173, Graceville, Florida 32440. I live with my husband, James Thomas Ealum, Jr.
who is, and has been for over ten years, minister at Mt. Olive Assembly of God Church.
Margaret Williams, the above named plaintiff, has been a member of our congregation for
six years.

        3.      Following church services on March 11, 2007, my husband and I traveled to
Geneva, Alabama to have lunch and decided to do some shopping at the local Wal-Mart
store.  When we arrived, Marie Strickland, Mrs. Williams' sister, was there and told us Mrs.
Williams had fallen as she was leaving the check-out area.  We immediately went to where
Mrs. Williams was lying which was an area adjacent to the check-out counters and near the
exit door.

        4.      Mrs. Williams was quite obviously in significant pain and especially
mentioned her right leg.  Someone mentioned a puddle of water on the floor very near
where Mrs. Williams was lying and I personally saw what this person was referring to.



PLAINTIFF'S
EXHIBIT
"A"

5.      There were a number of Wal-Mart employees in the area including some who continued to operate the cash registers and others who attempted to determine what happened and one who took pictures. There was also a gentleman who identified himself as an EMT who assisted Mrs. Williams until the ambulance arrived. I am very certain there was a puddle of water because of the person who mentioned it which in turn made me pay particular attention to it. We agreed this is what made Mrs. Williams fall. I saw a Wal-Mart employee retrieve paper towel from near a cash register to clean up the water puddle. I also saw the gallon of milk Mrs. Williams had been carrying. The milk leaked into the bag but not onto the floor. A Wal-Mart employee got a replacement milk container from the near-by cooler.

6.      While we were there, I heard Marie Strickland, Mrs. Williams' sister, tell a Wal-Mart employee who was completing a form about the water on the floor. Based upon my personal observations, it is my opinion a cashier could easily have seen the water had they been monitoring the floor in the area. We later went to the hospital where Mrs. Williams was operated on for a broken right leg.

Further, affiant sayeth not.

_Eloise S. Ealum_
Eloise S. Ealum

Sworn to and subscribed before me, this 31st day of July, 2008.

CARRIE NICHOLE ARD
MY COMMISSION # DD 800652
EXPIRES: July 26, 2012
Bonded Thru Notary Public Underwriters

_Carrie Nichole Ard_
Notary Public
My Commission Expires 7/26/2012

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **MARGARET WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:07CV1108-MHT** |
| | ) | |
| **WAL-MART STORES EAST, L.P.,** | ) | |
| **et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>AFFIDAVIT OF REV. JAMES THOMAS EALUM, JR.</u>

STATE OF FLORIDA:
COUNTY OF HOLMES:

Before me, the undersigned authority, personally appeared the Reverend James Thomas Ealum, Jr., who after being by me first duly sworn, did depose and state:

1.     My name is JAMES THOMAS EALUM, JR. and I am over the age of twenty-one (21). I am in no way disqualified from providing the following sworn statement and I do so based upon my own personal knowledge of the matters stated herein.

2.     I am a resident citizen of Holmes County, Florida and reside at 1657 Highway 173, Graceville, Florida 32440. In addition to running a cabinet business with my sons, I am the minister of Mt. Olive Assembly of God Church in Holmes County, Florida. I have been the minister of Mt. Olive for over ten years. Margaret Williams, the plaintiff in the above styled cause, has been a member of our congregation for six years.

3.     Following church services on Sunday, March 11, 2007, my wife, Eloise, and I traveled to Geneva, Alabama to have lunch and then decided to do some shopping at the local Wal-Mart store. Upon our arrival at Wal-Mart, we encountered Marie Strickland, a sister of Margaret Williams. Mrs. Strickland told us Mrs. Williams had fallen in the store and we immediately proceeded to Mrs. Williams' side.

4.     It was readily apparent Mrs. Williams was in significant pain and she complained particularly of her right leg. I observed there was of puddle of water in close proximity to where Mrs. Williams had fallen. The scene was immediately adjacent to the check-out counters and near the exit doors. There were a number of Wal-Mart employees around as well as a gentleman who identified himself as an EMT. I am one hundred percent

1


PLAINTIFF'S
EXHIBIT
"B"

certain there was a puddle of water because another person pointed it out to us and suggested that was what caused Mrs. Williams to fall. Upon that mention, I then saw the water myself and agreed with that judgment.

5. Based upon my personal observations, there were a number of cashiers on duty at the time, as well as other employees who were apparently in management. I saw paperwork being completed and I heard Mrs. Strickland advise store personnel about the water.

6. After Mrs. Williams left the store via ambulance, we completed our trip and later went to the hospital in Dothan where Mrs. Williams was admitted for surgery.

Further, affiant sayeth not.

James Thomas Ealum, Jr.

Sworn to and subscribed before me, this 31st day of July, 2008.

CARRIE NICHOLE ARD
MY COMMISSION # DD 800652
EXPIRES: July 26, 2012
Bonded Thru Notary Public Underwriters

Notary Public
My Commission Expires 7/26/2012

2

Thank You



## Claim # L7737270



- **Your form has been sent to the claims division.**
- **Please PRINT THIS FORM for your records before returning to main screen.**

**STORE TYPE**

Store/Location Number : 1063
Base Division Number : 01 - WAL-MART ASSOCIATES - US

**STORE/LOCATION INFORMATION**

Address : 1608 W. MAGNOLIA AVE., GENEVA, AL, 36340
Phone : 334 6843681
Manager : REED
Division Charged :
Section Code :
Accident Related to Store Set-up ? No
Store Set-up type : N/A
Project Store Number : —

**CLAIM TYPE**

Type of Incident :SLIP/FALL/TRIP Claim involving a customer/member that alleges slip, fall, or trip.

**SLIP/FALL INFORMATION**

Type of floor : TILE
Defects ? No
Number of photos taken : 5
Was surface clean ? Yes
Description : CLEAN TILE FLOOR
Was surface dry ? No
Description : DROPS OF WATER
Obstructions ? No
Description : —
If obstruction merchandise, its UPC# : —
Item# : —
Substance : —
Source of substance : —
Amount : —
Condition of substance : —
Customer wearing glasses ? No
Carrying bundles/objects ? Yes
Pushing cart ? No
Shoe type : DRESS SHOE
Weather conditions ? SUNNY

**INCIDENT GENERAL INFORMATION**

Date of Incident : 3/11/2007 1:45:00 PM
Date facility notified of incident : 3/11/2007
Incident State : AL
Was medical treatment sought at time of Incident or mentioned by the customer/member ? Yes
Incident Location Information
Did incident happen on premises ? Yes
Address where injury occurred : 1608 W. MAGNOLIA AVE., GENEVA, AL, 36340

PLAINTIFF'S EXHIBIT 8

PLAINTIFF'S EXHIBIT "C"

Thank You                                                                                                                    Page 2 of 2

**Phone : 334 6843681**
**Witness Information**
**Was there a customer that witnessed the** **Yes**
**incident ?**
**Associate with Facts Relating to Incident**
**Name : NEWMAN, ANNIE**
**Title : CASHIER**
**Associate First on Scene**
**Name : NEWMAN, ANNIE**
**Title : CASHIER**
**Associate Who Took the Report**
**Name : ELMORE, DEBORAH**
**Shift : First Shift**
**Work Phone : 334 6843681**
**Associate Entering Claim into Incident Reporting System**
**Name : ELMORE, DEBORAH**
**Title : ASST MANAGER**
**Shift : First Shift**
**CLAIMANT # 1**
**Name : WILLIAMS, MARGARET**
**What language does claimant speak ? English**
**Associate ? No**
**Did customer continue to shop ? No**
**Was ambulance called ? Yes**
**Was MD or hospital involved ? Yes**
**Companion Information**
**Did claimant have a companion ? Yes**

Go to Main Screen

IN THE U. S. DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MARGARET WILLIAMS,

    PLAINTIFF,

  VS.            CASE NO. 1:07CV1108-MHT

WAL-MART STORES, INC.,

    DEFENDANT.


    The deposition of LAURA LAVALLE, taken

by the Plaintiff, pursuant to the Federal

Rules of Civil Procedure, before Stacey

Watkins, RPR, and Notary Public, State at

Large, at the Geneva County Courthouse,

Geneva, Alabama, on the 28th day of May,

2008, at 1:45 p.m., CDT, pursuant to notice.


* * * * *


APPEARANCES:

FOR THE PLAINTIFF:    FOR THE DEFENDANT:

MR. LARRY GIVENS     MS. JENNIFER A. DOUGHTY
Attorney at Law      Attorney at Law
Dothan, Alabama      Mobile, Alabama

ORIGINAL



PLAINTIFF'S
EXHIBIT
D

Blumberg No. 6113

PLAINTIFF'S EXHIBIT



13

1    Q    This is probably going to seem like
2  a little bit of an obvious question that
3  everybody with walking around sense ought to
4  know, but I kind of want it to get it on the
5  record.
6    A    Okay.
7    Q    Could you kind of elaborate for me
8  as to what your duties were as a cashier for
9  Wal-Mart on the day of this accident?
10   A    Checking people out, making sure my
11 register was clean, zoning the register area.
12   Q    Doing what, now? Zoning?
13   A    Zoning the register area. It's,
14 like, facing. And taking care of customers.
15 Service.
16   Q    Can you elaborate for me as to what
17 you mean by zoning the area?
18   A    Pulling everything forward.
19 Pulling the products on the shelves forward
20 around the cash register that I was at.
21   Q    Any other duties associated with
22 zoning the area?
23   A    Walking my area to make sure it was
24 clean, cashing people out.
25   Q    What kind of training did Wal-Mart

14

1  give you to be a cashier?
2    A    We take -- when we first start, we
3  take CBL's.
4    Q    What is that?
5    A    Computer programs that you have to
6  take. You have to make a certain percentage
7  before you can actually start on the front
8  end to learn about the front end.
9    Q    And "the front end" being that area
10 of the store where the checkout is?
11   A    Yes, sir. When you get through --
12 when you make your percentage on the CBL's,
13 you're sent up front to train with cashiers
14 that have been there, and they teach you what
15 to actually do.
16   Q    Does that include, like, pulling
17 the stock forward?
18   A    Yes, sir.
19   Q    Helping the customers, and kind of
20 making sure your area is clean and so forth?
21   A    Yes, sir.
22   Q    All those sorts of things?
23   A    Yes, sir.
24   Q    When you're actually working with
25 an experienced cashier, they go through all

15

1  of those things with you? Correct?
2    A    Yes, sir.
3    Q    Is the Wal-Mart, as it exists today
4  -- and I'm talking about right around the
5  checkout area -- is it pretty much laid out
6  the same as it was on the day Ms. Williams
7  fell?
8    A    Basically. There are a few things
9  that have been moved around. I mean, not as
10 far as the cash registers. But, like, right
11 beside the door, there is bins there now,
12 where there used -- there were different bins
13 there when that happened.
14   Q    And when you say "beside the door,"
15 how is this Wal-Mart laid out as far as
16 entrance and exits go?
17   A    The entrance is on one side, the
18 service desk, and then, the cash registers
19 are on this side, with the doors right here
20 behind the cash registers for the exit.
21   Q    So, there's basically one door to
22 come in --
23   A    And one door --
24   Q    A double door to come in and a
25 double door to go out?

16

1    A    Yes, sir. Two double doors on each
2  side.
3    Q    When we say "two double doors,"
4  let's try and be kind of clear on that. When
5  I say a double door, I'm talking about one
6  exit that is made up of two doors. What does
7  that mean to you?
8    A    There's one that opens one way, one
9  that opens another. That's one double door.
10 And then, there's another one that opens one
11 way and opens another way.
12   Q    And is that for both the entrance
13 and the exit?
14   A    Yes, sir.
15   Q    And is there a little enclosed,
16 glassed-in lobby area before you go out
17   A    Yes, sir.
18   Q    -- into the parking lot?
19   A    Yes, sir.
20   Q    I think they call it a weather
21 barrier or something like that, to kind of
22 keep the air conditioning from getting out?
23   A    Lobby.
24   Q    Something like that. How many cash
25 registers are there?

PLAINTIFF'S
EXHIBIT
Newman
Deposition
Bumberg No. 6513

**17**

1    A    Eight.

2    Q    And how are those arranged?

3    A    1, 2 -- 2 is behind 1.  3 is --

4    Q    They're stacked, in other words?

5    A    3 is beside 1, and 4 is behind 3

6    and beside 2.

7    Q    So, for purposes of trying to get a

8    description on paper, is it fair to say,

9    then, that there are a total of eight cash

10    registers, and they are configured such that

11    there are four checkout aisles with two cash

12    registers per aisle?

13    A    Yes, sir.

14    Q    Does that sound right?

15    A    Yes, sir.

16    Q    So, on one aisle, you would have

17    cash register 1 and 2, and the next aisle,

18    you would have 3 and 4, and the next aisle,

19    you would have 4 and 5?

20    A    Yes, sir.  But each register is

21    faced a different way.

22    Q    So that if you're coming down aisle

23    1, you could check out on which cash

24    registers?

25    A    Only on 1.

**18**

1    Q    So, aisle 1 is one register only?

2    A    Yes, sir.

3    Q    Then, the next aisle, which cash

4    registers could you check out on?

5    A    3 and 2.

6    Q    And then, the third aisle?

7    A    Would be 5 and 4.

8    Q    And then, the fourth aisle?

9    A    The fourth aisle, you can check out

10    at 8, 7 and 6, because the wall is on the

11    other side.  So, 8 and 7 both face the same

12    way.

13    Q    The same way.  So, in the fourth

14    aisle, you're able to get to three cash

15    registers?

16    A    Yes, sir.

17    Q    Which cash register were you

18    working on the day Ms. Williams fell?

19    A    I'm not sure.

20    Q    Can you narrow it down to --

21    A    Either 3 or 5.

22    Q    Okay.  Either 3 or 5.  So, in order

23    for you to wait on someone, as to checkout

24    aisles 1, 2, 3 and 4, what aisle would

25    someone had to have been in, in order for you

**19**

1    to wait on them, if you were on either 3 or 5

2    cash registers?

3    A    They would have had to have been in

4    the second or third aisle.

5    Q    So, 3 if they were in the second

6    aisle, 5 if they were in the third aisle?

7    A    Yes, sir.

8    Q    Do you remember how many other

9    cashiers were working that day?

10    A    No, sir.

11    Q    Was there more than one?

12    A    Yes, sir.

13    Q    You were not the only cashier

14    working?  Correct?

15    A    Correct.

16    Q    Do you remember who else, in the

17    way of cashiers, might have been working

18    besides yourself, to your recollection?

19    A    No, sir.

20    Q    Who else could possibly have been

21    working that day?  In other words, just give

22    me the names of some of the other cashiers

23    that you were used to working with during

24    that general time?

25    A    I really couldn't tell you.

**20**

1    Q    So, what you're telling me today is

2    you didn't know any of the names of your

3    fellow cashiers?

4    A    There's been so many since then, I

5    couldn't remember which ones were working and

6    which ones weren't.

7    Q    But my question is not which ones

8    were working, but just the names of people

9    who were cashiers at Wal-Mart during that

10    general time frame.  Can you help me with

11    that?

12    A    Talaytha Robinson.

13    Q    Talaytha?

14    A    She's been there since I've been

15    there.

16    Q    And she still works there?

17    A    Yes, sir.

18    Q    Her last name, is it Robinson?

19    A    Robin, like --

20    Q    You think it's R-o-b-i-n-s-o-n?

21    A    Yes, sir.

22    Q    Is she still a cashier?

23    A    Yes, sir.  Well, she's

24    cashier/service desk associate.

25    Q    Kind of the same as your duties?

1    saying that her knee hurt.

2        Q    She was more concentrating on the

3    injury than how the injury occurred?

4        A    Yeah.

5        Q    Sure.

6        A    She was basically just, you know,

7    saying that she had fell and that her knee

8    hurt.  She did make the statement that she

9    had just recovered from a medical problem

10   with her other knee or her other leg.  That

11   was basically the extent of her, you know,

12   focus, was on --

13       Q    The injury itself?

14       A    Yeah.

15       Q    Okay.  Sure.  Did you hear anyone

16   else make any statements about how the event

17   occurred?

18       A    Only what her sister told me.

19       Q    I apologize if I'm being

20   repetitive.  But, what did her sister say,

21   again?

22       A    Said she had fell down.  She was

23   carrying a gallon of milk, and she had

24   slipped down.  That was basically what she

25   told me.



PLAINTIFF'S
EXHIBIT
Lavelle Depo

1    The associate that took the report signs it.

2    It's just basic information.

3        Q    Did Ms. Williams give a statement?

4        A    She did.

5        Q    And she gave that directly to you?

6        A    She did.

7        Q    What did she say?

8        A    She said that she had fallen, that

9    her knee was hurting.  And then, she was

10   unable to continue with the information.

11       Q    Why was that?

12       A    She said she was in pain.

13       Q    Did you get any additional

14   information from someone else on her behalf?

15       A    Yes, I did.

16       Q    And from whom did you get that?

17       A    I believe it was her sister.

18       Q    Was her sister on the scene, as

19   well?

20       A    Yes.

21       Q    What did her sister tell you?

22       A    She had fallen.

23       Q    Is that pretty much it?  Just that

24   she had fallen?

25       A    That was pretty much -- that's all



PLAINTIFF'S
EXHIBIT
Lavelle
DCPD
Blumberg No. 5113

1    I remember her saying.

2        Q    Were you able to conclude that she

3    had fallen from observing her yourself when

4    you walked up?

5        A    Yes.

6        Q    In other words, she was lying on

7    the floor?  Correct?

8        A    Yes.

9        Q    Where was she lying?

10       A    She was lying in front of register

11   4, half on the tile and half on the carpet by

12   the automated exit door.

13       Q    Okay.  You mentioned tile in front

14   of the -- you call it an automated exit door?

15       A    Yes.

16       Q    In other words, it's one of those

17   that, when you walk up to it, it's going to

18   automatically open and let you out?

19       A    Correct.

20       Q    You mentioned there's carpet inside

21   the store before you get to that door?  Is

22   that right?

23       A    Yes.

24       Q    Do you know why that carpet is

25   placed there?



PLAINTIFF'S
EXHIBIT

Lavelle
Depo

1    that day?

2          A      Yes, sir.

3          Q      Who let you know that someone had

4    fallen?

5          A      Annie Newman.

6          Q      Do you recall how many cashiers

7    were working that day?

8          A      No, sir.  It's been a while ago.

9          Q      Sure.  My understanding is, the

10   most you're ever going to have is eight?

11   Correct?

12         A      Right.

13         Q      Because that's how many cash

14   registers you have?

15         A      Yes, sir.

16         Q      So, the fewest you would ever have

17   is one.  The most you would ever have is

18   eight?

19         A      Right.

20         Q      And we know, from what you've just

21   told us and from earlier testimony today,

22   that Annie Newman was working that day.

23         A      Uh-huh.

24         Q      Do you have a recollection that

25   there were other cashiers working, as well?



PLAINTIFF'S
EXHIBIT pgs.
Lavelle
Depo 11-12

12

1   A  Yes, sir.  There was a few more.

2   Q  Can you give me a range?  Four to

3 five?  Five to six?  Somewhere in there?

4 Because the most we're dealing with is eight.

5   A  I would say at least between three

6 and five.

7   Q  Between three and five?

8   A  Yeah.

9   Q  Do you, by chance, recall which

10 cash registers were open?

11   A  1, 7 and 5, definitely.

12   Q  Okay.  Do you recall which cash

13 register Annie Newman was on?

14   A  5.

15   Q  Where is 5 located?  As I

16 understand it, there are four checkout aisles

17 with some variation of one to two and maybe

18 three registers per aisle.  As I understand

19 1, there's only -- in aisle 1, you can only

20 get to one cash register?

21   A  Right.

22   Q  But there's one aisle that you can

23 get to three?  Is that right?  Does that

24 sound right?

25   A  On the very end, you can get to two

1    fall?

2         A     I was.

3         Q     Where were you located when she

4    fell, or when you learned that she had

5    fallen?

6         A     Close to the service desk.

7         Q     Explain to me where the service

8    desk is in relationship to the checkout

9    counters at the Wal-Mart here in Geneva?

10        A     Okay.  As you're facing the

11   counters, like, all the checkouts right here,

12   the service desk is more off to the right,

13   like, close to the front entrance doors.

14        Q     And when you're talking about

15   facing them, you're talking about facing them

16   from inside the store --

17        A     Right.

18        Q     -- looking toward the front wall of

19   the store?

20        A     Yes, sir.

21        Q     Such that the checkout counters

22   would be on the left and the customer service

23   counter would be on the right?

24        A     Yes, sir.

25        Q     And the customer service counter



PLAINTIFF'S
EXHIBIT
Lavelle
Pages 9-10

Blumberg No. 5113

1  would be more convenient for people coming

2  into the store?

3       A    Right.

4       Q    And the checkout counters are

5  naturally set up for people about to leave

6  the store?

7       A    Right.  Yes, sir.

8       Q    Could you observe the area where

9  Ms. Williams fell from where you were

10  located?

11       A    I could.

12       Q    Did you see her fall?

13       A    I didn't actually see her fall.

14  No, sir.

15       Q    Did you hear any commotion or

16  anything that turned your attention to that

17  area?

18       A    Yes, sir.

19       Q    What did you hear?

20       A    I just heard, you know, people

21  talking real loud, and, you know, just the --

22  I guess the overwhelming of what happened.

23  And then, my cashier at the time had let me

24  know that somebody had fell.

25       Q    Were you in charge of the cashiers

IN THE U. S. DISTRICT COURT

MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


MARGARET WILLIAMS,

    PLAINTIFF,

  VS.           CASE NO. 1:07CV1108-MHT

WAL-MART STORES, INC.,

    DEFENDANT.


    The deposition of DEBORAH ELMORE, taken
by the Plaintiff, pursuant to the Federal
Rules of Civil Procedure, before Stacey
Watkins, RPR, and Notary Public, State at
Large, at the Geneva County Courthouse,
Geneva, Alabama, on the 28th day of May,
2008, at 12:30 p.m., CDT, pursuant to notice.


             * * * * *

APPEARANCES:

FOR THE PLAINTIFF:    FOR THE DEFENDANT:

MR. LARRY GIVENS     MS. JENNIFER A. DOUGHTY
Attorney at Law      Attorney at Law
Dothan, Alabama      Mobile, Alabama

ORIGINAL

PLAINTIFF'S
EXHIBIT
E
Blumberg No. 5113

1      Q     Anyone else?

2      A     Laura Lavalle.

3      Q     Anybody else you can think of?

4      A     Annie Newman.  Other than that, I
5  don't recall anyone else.

6      Q     Do you recall who all was working
7  as cashiers that day?

8      A     No.

9      Q     Would Wal-Mart have a record of the
10  employees who were assigned to cashier duty
11  at that time?

12      A     Certainly.

13      Q     Do you have a judgment as to how
14  many cash registers were open at that time?

15      A     I'm not sure.

16      Q     What's your best judgment?

17      A     Actual registers?

18      Q     Uh-huh.

19      A     Probably four.  That's a guess.

20           (Brief off-record.)

21      Q     Did you hear Ms. Williams say
22  anything to anybody else?  What I need to
23  know is everything you heard her say, whether
24  it was to you or to anyone else.

25      A     Oh, gosh.  She basically just kept


PLAINTIFF'S
EXHIBIT
Elmore Dep
Footnote 5

1    A    No.

2    Q    What was your position at that

3  point?

4    A    At that point, I was over the front

5  end, jewelry, shoes, domestics and apparel.

6    Q    The fall that Ms. Williams had, did

7  that occur in what y'all would refer to as

8  the front end?  Is that right?

9    A    That's correct.

10    Q    What constitutes the front end of

11  the store?

12    A    The registers.  From the registers

13  all the way to the front door.

14    Q    Does that include the customer

15  service desk?

16    A    Yes.

17    Q    How long have you worked for

18  Wal-Mart?

19    A    Six years.

20    Q    Has that all been in Geneva?

21    A    No.

22    Q    Where else have you worked for

23  Wal-Mart?

24    A    Ozark, store 740.  Enterprise,

25  store 734.



PLAINTIFF'S
EXHIBIT
Elmore Depo
Pg 36 & 7

1    understand is get some sense of whether this

2    is an event that you consider routine and

3    something that happens along and along, such

4    that it would not particularly stick out in

5    your memory, or if this is something more

6    significant, where one might expect it to

7    stick out in your memory.  Do you see what

8    I'm saying?

9         A    Yes, I understand.

10        Q    How would you characterize that?

11        A    Of course I would consider it

12   significant.

13        Q    But, as we sit here today, you

14   don't have any recollection one way or the

15   other of talking to Mr. Reed about this

16   event?

17        A    I don't recall the specific

18   conversation with Michael.  No.

19        Q    But, when you say you don't recall

20   the specific conversation, do you recall a

21   conversation where you spoke with Mr. Reed

22   and informed him of the events surrounding

23   Ms. Williams' fall?

24        A    I don't recall the specific

25   conversation with Michael.  I do know that he

PLAINTIFF'S
EXHIBIT
Elmore Depo
Footnote "7"
Blumberg No. 5113

```
1    The associate that took the report signs it.

2    It's just basic information.

3         Q    Did Ms. Williams give a statement?

4         A    She did.

5         Q    And she gave that directly to you?

6         A    She did.

7         Q    What did she say?

8         A    She said that she had fallen, that

9    her knee was hurting.  And then, she was

10   unable to continue with the information.

11        Q    Why was that?

12        A    She said she was in pain.

13        Q    Did you get any additional

14   information from someone else on her behalf?

15        A    Yes, I did.

16        Q    And from whom did you get that?

17        A    I believe it was her sister.

18        Q    Was her sister on the scene, as

19   well?

20        A    Yes.

21        Q    What did her sister tell you?

22        A    She had fallen.

23        Q    Is that pretty much it?  Just that

24   she had fallen?

25        A    That was pretty much -- that's all
```



PLAINTIFF'S
EXHIBIT
Elmore
Depo
Blumberg No. 5119

1    A    Correct.

2    Q    We've already kind of touched on

3    this a little bit, but I want to make sure I

4    get a few things clear as a matter of record.

5    This fall took place in an area immediately

6    adjacent to the cash registers and the

7    checkout lanes?  Correct?

8    A    Correct.

9    Q    And the area between the checkout

10   lanes, is that part of the floor space where

11   a person has to walk across to get from the

12   checkout counter to exit the store?

13   A    Correct.

14   Q    And we've mentioned two kinds of

15   surfaces, a tile floor and a carpeted area.

16   But the carpeted area we referred to, that's

17   really just some rugs that are laid over the

18   tile floor?  Correct?

19   A    They're not just laid over the tile

20   floor.  They're not just rugs.

21   Q    That's actual carpet?

22   A    That's actual carpet.  Yes.

23   Q    In other words, it's not something

24   where a cleaning service can periodically

25   come in, pick that up, take it and clean it



PLAINTIFF'S
EXHIBIT
Elmore
Deposition

```
1                    (Whereupon, Plaintiff's Exhibit 8
2                 marked for identification.)
3          Q    I want to show you a document that
4    was provided to us in the course of
5    discovery.  It is Bates numbered, at the
6    bottom, Wal-Mart 00005 and 00006.  The court
7    reporter has labeled it as Plaintiff's
8    Exhibit 8.  And, at the top, it refers to
9    claim number L7737270.  I ask you to look at
10   that and identify it, if you can, please?
11         A    Yes.  This is the document I sent
12   to CMI.
13         Q    Okay.  So, what we were talking
14   about earlier, as far as a computer-generated
15   document that you're supposed to send to CMI
16   within 24 hours of an accident in the store,
17   that's a hard copy of what would have been
18   seen on the computer screen if I were looking
19   at it?
20         A    That's correct.
21         Q    Let me see it just a minute.
22         A    (Handing document to Mr. Givens.)
23         Q    And it indicates that the associate
24   entering the claim into the incident
25   reporting system is Deborah Elmore.
```



PLAINTIFF'S
EXHIBIT
Elmore Depo
Pages 30-33

1      A      Correct.

2      Q      And that's you?  Correct?

3      A      That's correct.

4      Q      Did you do this within the 24 hours

5      required by Wal-Mart?

6      A      Yes, I did.

7      Q      Did you do it that same afternoon?

8      A      Yes, I did.

9      Q      One of the questions that is on

10     here is whether or not the surface was dry.

11     And, on this form, you've put the answer

12     "No."  And for a description, you put "Drops

13     of water."  Do you recall doing that?

14     A      Yes, I do.

15     Q      I understood your earlier testimony

16     to be that the floor was dry, there was

17     nothing on it.

18     A      That's correct.

19     Q      That confuses me as to an entry

20     here where it says it's not dry and there

21     were drops of water, and testimony that it

22     was dry.  Kind of clarify that for me, if you

23     would?

24     A      Okay.  When we fill those forms

25     out, we put on there what the customer

1    states.   She stated there was drops of water

2    on the floor.   That's what I put on there.

3         Q    Okay.   But, based on your

4    observation, you never did find anything on

5    the floor?

6         A    No.

7         Q    And if the sister testified in this

8    case that there was a puddle of water, you

9    would simply disagree with that?

10        A    That is true.

11        Q    Is it possible to see the area

12   where Ms. Williams fell if one is a cashier?

13   In other words, can you basically just turn

14   your head and see the area where she fell?

15        A    Depending on what register you're

16   on, yes.

17        Q    Which registers would you expect

18   someone would be able to see that area from?

19        A    7, 8, 5 and 6, possibly 3 and 4.

20   They're all just, like, right there.

21        Q    As part of your duties as front end

22   assistant manager, did you supervise the

23   cashiers?

24        A    Yes.

25        Q    What are expected of the cashiers

1    in terms of job duties and things that

2    Wal-Mart expects them to do?

3         A    Their number one job, of course, is

4    to check people out as fast and efficiently

5    and friendly as possible.  And number two is

6    to keep a check on the front end for any

7    safety hazards, take care of the customers.

8    In the event that something does happen, stay

9    with that customer.  Guard a spill.  Clean it

10   up, if possible.  If not, call maintenance.

11   And inform management of any issues on the

12   front end.  All of that is part of their job.

13        Q    So, they're affirmatively taught to

14   look out for spills or hazards that could

15   present a safety threat to the customers?

16        A    Yes.

17        Q    Have you ever known of those two

18   coolers that are in that front end area to

19   leak?

20        A    Not to my knowledge.

21        Q    Have you ever known of them to

22   require maintenance?

23        A    Certainly.

24        Q    Who does the maintenance on those?

25        A    Dairy Fresh.

37

1    saying that her knee hurt.

2        Q    She was more concentrating on the

3    injury than how the injury occurred?

4        A    Yeah.

5        Q    Sure.

6        A    She was basically just, you know,

7    saying that she had fell and that her knee

8    hurt.  She did make the statement that she

9    had just recovered from a medical problem

10    with her other knee or her other leg.  That

11    was basically the extent of her, you know,

12    focus, was on --

13        Q    The injury itself?

14        A    Yeah.

15        Q    Okay.  Sure.  Did you hear anyone

16    else make any statements about how the event

17    occurred?

18        A    Only what her sister told me.

19        Q    I apologize if I'm being

20    repetitive.  But, what did her sister say,

21    again?

22        A    Said she had fell down.  She was

23    carrying a gallon of milk, and she had

24    slipped down.  That was basically what she

25    told me.



PLAINTIFF'S
EXHIBIT
Elmore
Depo

1      Q    And it's safe to say that she

2  bought the gallon of milk there at the

3  Wal-Mart?

4      A    I hope so.

5      Q    Didn't bring it in with her, did

6  she?

7      A    (Witness laughing.)

8      Q    Were there any "Wet floor" signs in

9  the area?

10     A    Not that were open.  The floor

11  wasn't wet.

12     Q    So, the answer to that is, no,

13  there were no "Wet floor" signs?

14     A    No.

15     Q    Have you reviewed any material in

16  preparation for this deposition?  Any

17  reports, photographs, documents of any kind?

18     A    I did review the file, yes.

19     Q    What all is in the file?

20     A    The report, photographs,

21  statements.

22     Q    When you say "the report," are you

23  talking about this one that --

24     A    Yes.

25     Q    -- we've identified as Exhibit 8?



PLAINTIFF'S
EXHIBIT
Blumberg No. 6113
ELmore
Pages 37-38

1  A  Yes.

2  Q  That report?

3  A  Yes.

4  Q  Okay.  And then, the statements

5 would be the one given by the -- we're going

6 to call it Stephanie Edelstein until we find

7 out differently.  But, that one, and then,

8 also, I believe a Wal-Mart employee gave a

9 written statement, as well?

10  A  Yes.

11  Q  Annie Newman?

12  A  Yes.

13  Q  Anything else?

14  A  No.

15  Q  Have you seen any video

16 surveillance of this event?

17  A  No.

18  Q  Do you know if any video

19 surveillance film exists that would depict

20 this event and the few minutes before and the

21 few minutes after Ms. Williams fell?

22  A  No.

23  Q  And the way I phrased that, I

24 probably need to get some clarification,

25 because I asked you if you knew if any

1       A       Yes.

2       Q       Concentrating on the area around

3    the checkout counter and the cash registers

4    and so forth, do you know how many cameras

5    are used to monitor that area?

6       A       There's probably 12 to 14.

7       Q       That monitor just the cash

8    registers?

9       A       There's one on each register.

10      Q       And then, the areas around it?

11   Part of the purpose of those cameras is to

12   help fight shoplifting?  Correct?

13      A       Correct.

14      Q       And then, another purpose would be

15   to monitor movement of cash in and out of the

16   drawers, to make sure that goes on in an

17   appropriate fashion?  Is that right?

18      A       Correct.

19      Q       Would you expect the area where Ms.

20   Williams fell to show up on one of those 14

21   cameras, one or more of those 14 cameras?

22      A       Normally, yes.

23      Q       Did anyone, whether it be you or

24   another assistant manager or the store

25   manager or anyone external to that store,

1    there.

2        A    I'm, like, okay.  You're going to

3    have to repeat that question.

4        Q    To kind of summarize, there is a

5    video surveillance system that existed on the

6    day of this event?  Correct?

7        A    Correct.

8        Q    And that video surveillance system

9    includes the capability of recording -- not

10   merely observing, but recording things that

11   the camera sees?  Correct?

12       A    Correct.

13       Q    In other words, if somebody were

14   shoplifting, y'all would want to have video

15   evidence to show that that person shoplifted,

16   as a for instance?  Correct?

17       A    Correct.

18       Q    And if there were a cashier who,

19   heaven forbid, was not the most honest person

20   in Geneva County, and they put in one 20 and

21   take out three 10's, y'all would want to be

22   aware of that?  Correct?

23       A    That's correct.

24       Q    And if, heaven forbid, somebody

25   falls in your store, it might be a good idea

PLAINTIFF'S
EXHIBIT
Elmore Depo
Pages 48-50

1    to have evidence of that?  Correct?

2         A     That's correct.

3         Q     Now, my question is -- I'm trying

4    to get to the existence of and current status

5    of any video evidence surrounding this event.

6    And I would be interested in that time frame

7    a few minutes before the event and a few

8    minutes after.  Okay.

9         And we've established, I think, that you

10   had some conversation with Mr. Reed, who is

11   the store manager.  Obviously, he was not

12   there, or, to my understanding, he was not

13   there that day.  But, when he next came in to

14   work, he was filled in on what happened?

15   Correct?

16        A     That's correct.

17        Q     Okay.  And you've indicated that he

18   would have been responsible for the

19   surveillance tape.  Is that accurate or not?

20        A     Any member of management.  The

21   bottom line is, yes.

22        Q     But y'all never watched the tape of

23   this area in the time frame surrounding this

24   fall?

25        A     I don't recall that, no.

1      Q      Do you recall ever hearing if the

2    tape was transferred to another Wal-Mart

3    location, to Claims Management, Incorporated,

4    or anywhere else?

5      A      No.

6      Q      Have you ever been involved in any

7    other instances where a customer fell and

8    there was a videotaped surveillance of that

9    incident?

10      A      No.

11            MS. DOUGHTY:  Just so I may

12                  clarify, if I may, on that,

13                  what he's asking is if there

14                  have ever been other incidents

15                  where Wal-Mart has had a video

16                  and forwarded it on.

17            THE WITNESS:  Oh, certainly.

18            MR. GIVENS:  Thank you.

19      Q      So, you are aware of instances

20    where Wal-Mart does have videotapes, and they

21    forward them somewhere?

22      A      Oh, certainly.  Yes.  I thought you

23    meant that I had been directly involved in,

24    that I went and got the --

25      Q      That you did it yourself?

1     IN THE U. S. DISTRICT COURT

2       MIDDLE DISTRICT OF ALABAMA

3           SOUTHERN DIVISION

4

5     MARGARET WILLIAMS,

6         PLAINTIFF,

7       VS.                    CASE NO. 1:07CV1108-MHT

8     WAL-MART STORES, INC.,

9         DEFENDANT.

10

11       The deposition of PHILLIP WOOD, taken

12   by the Plaintiff, pursuant to the Federal

13   Rules of Civil Procedure, before Stacey

14   Watkins, RPR, and Notary Public, State at

15   Large, at the Geneva County Courthouse,

16   Geneva, Alabama, on the 28th day of May,

17   2008, at 10:35 a.m., CDT, pursuant to notice.

18

19               *  *  *  *  *

20   APPEARANCES:

21   FOR THE PLAINTIFF:       FOR THE DEFENDANT:

22   MR. LARRY GIVENS         MS. JENNIFER A. DOUGHTY
     Attorney at Law          Attorney at Law
23   Dothan, Alabama          Mobile, Alabama

24

25

ORIGINAL


PLAINTIFF'S EXHIBIT
F

1    the floor, and I told her "No."

2        Q    As I understand your earlier

3    testimony, you did not check under where Ms.

4    Williams was lying.  You obviously did not

5    disturb her and try and feel up under where

6    she was.  But I also understood you to say

7    that the majority of her body was actually on

8    the rug as opposed to the tile floor?  Is

9    that right?

10       A    Correct.  She was on -- most of her

11   body was on the carpet.

12       Q    I want to show you what has earlier

13   been labeled Plaintiff's Exhibits 1 through

14   6, and ask you to identify those, if you

15   would?

16       A    On Exhibit 1, this would be

17   actually taken after she was removed from the

18   area.

19       Q    Okay.  Do you have any idea what

20   that red streak on the floor is?

21       A    That is probably from the barrel

22   that was in the corner just over there,

23   'cause it was red at the time.  The bottom of

24   it is still red.

25       Q    Okay.  Go ahead.



PLAINTIFF'S
EXHIBIT
Wood's Depo
Footnote 3

1    to --

2         A    To tell if there was --

3         Q    -- be able to look at the floor?

4         A    Yes, they could.  'Cause they're

5    usually either facing each other -- usually,

6    the cashiers are -- because they're designed

7    where, like, if someone comes to register 1,

8    the person -- like, you're the customer.

9         Q    Right.

10        A    At register 2, you would be -- the

11   customer is at register 1, and then, the

12   customer comes on the other side.  So, that

13   person at register 2 could see what was going

14   on toward the doors.

15        Q    And they could see the floor toward

16   the doors?

17        A    Correct.

18        Q    Did you observe any "Wet floor"

19   signs when you walked to the front where Ms.

20   Williams was?

21        A    There was none.

22        Q    Did you hear Ms. Williams make any

23   statements to anybody, say anything?

24        A    She was talking to the lady that

25   was doing the praying.  I really don't



PLAINTIFF'S
EXHIBIT
Wood's
Footnote "6"

1    Q    Do you know why they would have put

2    carpet there, though, on the exit, at the

3    exit?

4         MS. DOUGHTY:   Object to the form.

5    A    I don't know.

6    Q    And the rest of the checkout area

7    as it exists today, is it pretty much like it

8    was at the time Ms. Williams fell?

9    A    It's still the same.

10   Q    There are two freezers, or what I'm

11   calling freezers -- they may be refrigerator

12   units, actually, because they contain milk

13   and things of that nature.  So, they're

14   probably refrigerators as opposed -- well,

15   there are two cooler units -- let's call them

16   cooler units -- there in close proximity to

17   the checkout?   Correct?

18   A    They're at that back wall.

19   Q    And one of them holds milk, and the

20   other one holds ice cream and such as that?

21   A    Correct.

22   Q    So, one of them is a unit that will

23   keep things frozen, and the other one is more

24   like a refrigerator for milk and such as

25   that?

PLAINTIFF'S
EXHIBIT
Wood's Depo
Foot Note "8"

```
1        A     Yes.

2        Q     And those were both there in the

3   same location when Ms. Williams fell?

4        A     They're in the same spot.  Yes,

5   sir.

6        Q     Do you have any responsibilities

7   for that area of the store?

8        A     As far as being over that area?

9        Q     Yes, sir.

10       A     I was over food at that time.  So,

11  the dairy cooler and the freezer would have

12  been my responsibility.

13       Q     If there was a problem with those

14  coolers, would you have been the one to see

15  about getting it fixed?

16       A     I would have called Dairy Fresh,

17  who handles the maintenance on both coolers.

18       Q     Did you have any maintenance issues

19  with either one of those coolers within the

20  30 days before or the 30 days after Ms.

21  Williams fell?

22       A     I don't remember.

23            MS. DOUGHTY:  Object to the form.

24       Q     Would there be a record of that at

25  the store if you did?
```

1    Q    Is the area where she fell adjacent
2    to the checkout counters?
3    A    It's behind it.  It's close to the
4    doors.
5    Q    Are the checkout counters close to
6    the doors, as well?
7    A    Yes, sir.
8    Q    This particular Wal-Mart has, I
9    think, an eight-cash-register layout?
10    A    Correct.
11    Q    And it's not eight checkout aisles.
12    It's four checkout aisles with eight cash
13    registers worked into those four aisles?
14    Correct?
15    A    Yes.
16    Q    And, as we sit here today, you're
17    not certain whether a cashier would be able
18    to observe the area where Ms. Williams fell?
19    A    I'm not sure if one -- 'cause I was
20    not up there.  So, I don't know if anyone
21    actually saw her fall.
22    Q    I'm not talking about actually
23    seeing her fall.  I'm talking about, as a
24    general, broad scope observation, would
25    someone working those cash registers be able



PLAINTIFF'S
EXHIBIT
Wood's Depo

1          IN THE U. S. DISTRICT COURT

2          MIDDLE DISTRICT OF ALABAMA

3             SOUTHERN DIVISION

4

5    MARGARET WILLIAMS,

6         PLAINTIFF,

7       VS.                CASE NO. 1:07CV1108-MHT

8    WAL-MART STORES, INC.,

9         DEFENDANT.

10

11       The deposition of ANNIE C. NEWMAN,

12   taken by the Plaintiff, pursuant to the

13   Federal Rules of Civil Procedure, before

14   Stacey Watkins, RPR, and Notary Public, State

15   at Large, at the Geneva County Courthouse,

16   Geneva, Alabama, on the 28th day of May,

17   2008, at 9:00 a.m., CDT, pursuant to notice.

18

19             *  *  *  *  *

20   APPEARANCES:

21   FOR THE PLAINTIFF:     FOR THE DEFENDANT:

22   MR. LARRY GIVENS       MS. JENNIFER A. DOUGHTY
     Attorney at Law        Attorney at Law
23   Dothan, Alabama        Mobile, Alabama

24                          ORIGINAL

25



PLAINTIFF'S
EXHIBIT

Blumberg No. 6113

1    A    She's customer service manager.

2    Q    So, she would be below an assistant

3    manager?

4    A    Yes, sir.

5    Q    Was she more or less the supervisor

6    for the cashiers --

7    A    Yes, sir.

8    Q    -- and the customer service desk

9    that day?

10    A    Yes, sir.

11    Q    So, she came over?  Correct?

12    A    She did not come over to me.  She

13    called the --

14    Q    Store manager?

15    A    -- store manager, and they come up

16    front.  She walked over to the area.

17    Q    What did she do?

18    A    I was not paying attention at that

19    time.  I was busy checking out my customers.

20    Q    Okay.  So, customers continued to

21    check out while Ms. Williams was --

22    A    Yes, sir.

23    Q    I assume she was lying on the

24    floor?

25    A    Yes, sir.



PLAINTIFF'S
EXHIBIT
Newman
Footnote "2"
Blumberg No. 5113





Wal-Mart 00007



1          A      The part where I was checking out.
2    My cash register, around my register.
3          Q      Was part of your responsibility to
4    observe the area between the cash registers
5    and exit door, as well?
6          A      We observe all of it --
7          Q      All around?
8          A      -- as we walk, just going back and
9    forth, helping customers, pushing buggies up.
10         Q      Were you ever told during your
11   training to monitor the floors, to look out
12   for something that a customer could slip on?
13         A      Yes, sir.
14         Q      And do you recall monitoring the
15   floor to look out for something that a
16   customer could slip on prior to Ms. Williams
17   falling on that Sunday?
18         A      Yes, sir.  We're constantly going
19   through, checking everything, making sure
20   nothing is slippery, nothing is in the floor,
21   no trash.
22         Q      No liquids or anything like that?
23         A      No nothing on the floor.
24         Q      And you did that on the occasion
25   prior to the time Ms. Williams fell?



PLAINTIFF'S
EXHIBIT
Newman Depo

IN THE U. S. DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION

MARGARET WILLIAMS,

    PLAINTIFF,

  VS.               CASE NO. 1:07CV1108-MHT

WAL-MART STORES, INC.,
ET AL.,

    DEFENDANTS.

    The deposition of MARIE STRICKLAND, taken by the Defendants, pursuant to the Federal Rules of Civil Procedure, before Stacey Watkins, RPR, and Notary Public, State at Large, at the offices of Cochran, Cherry, Givens, Smith, Lane & Taylor, Dothan, Alabama, on the 1st day of May, 2008, at 11:00 a.m., CDT, pursuant to notice.

         * * * * *

APPEARANCES:

FOR THE PLAINTIFF:    FOR THE DEFENDANTS:

MR. LARRY GIVENS    MS. JENNIFER A. DOUGHTY
Attorney at Law      Attorney at Law
Dothan, Alabama      Mobile, Alabama

ALSO PRESENT:

MARGARET WILLIAMS



PLAINTIFF'S
EXHIBIT
H
Blumberg No. 6113

PLAINTIFF'S
EXHIBIT
Strickland
DepO

**17**

1    A    Yes.

2    Q    Running errands?

3    A    Yes.

4    Q    Helping out.  You said that you
5    didn't see anything on the floor when you
6    exited, and you saw the puddle of water
7    afterwards, when you came in to see your
8    sister?

9    A    (Witness nodding head in
10    affirmative.)

11    Q    Did you see anything else around
12    the area where she fell?

13    A    There was a refrigerator
14    compartment where they kept milk and stuff
15    there, and a barrel where they, I guess,
16    stored plastic -- you know, recyclable
17    plastic bags.

18    Q    That was to -- if you were walking
19    out of the store, to your left?

20    A    To my left, yes.

21    Q    Do you have any idea where the
22    water came from that you saw?

23    A    No, I don't.

24    Q    Was there a trail of it from
25    anywhere, or was it just an isolated, as you

**18**

1    explained, puddle?

2    A    As far as I know, just a puddle
3    there.  I was down on the floor by Margaret,
4    and I guess that's when I noticed it.

5    Q    Okay.  Did you see any track marks
6    through it?

7    A    No, I didn't.

8    Q    It was a clear puddle of water?

9    A    It looked clear, yes.

10    Q    Do you know if any Wal-Mart
11    employees saw that puddle shortly after your
12    sister fell?

13    A    Yes.  I do know that.  Yes.

14    Q    How do you know that?

15    A    Because we pointed it out, and they
16    saw it.

17    Q    Okay.  "They" being the person who
18    had the clipboard --

19    A    Yes.

20    Q    -- and the person that was taking
21    pictures?

22    A    Yes.

23    Q    Do you know if they knew if it had
24    been there very long?

25    A    I don't know.

**19**

1    Q    You said you spoke to one person
2    who took down your name and address and so
3    forth.  Did you speak to any other Wal-Mart
4    employees?

5    A    No.

6    Q    Approximately how long did it take
7    from the time you came back into the store to
8    see your sister to have her transported by
9    ambulance?  How many minutes?

10    A    20 minutes, maybe.

11    Q    Was she in that one spot the entire
12    time?

13    A    Yes.

14    Q    She was never moved?

15    A    Yes, she was in that spot.

16    Q    And did they come and put her on a
17    stretcher?

18    A    Yes.

19    Q    Do you recall if anybody came to
20    clean up the water that you say you saw?

21    A    No, I don't.

22    Q    So, during that time that your
23    sister was sitting there, no one --

24    A    No one cleaned it up.

25    Q    -- came to clean up?  And, after

**20**

1    she left, did you see anyone clean it up?

2    A    No.  When they went out with her, I
3    went out with her.

4    Q    Did they give you or your other
5    sister a replacement bottle of milk to take
6    for her?  Do you recall?

7    A    I don't recall.

8    Q    You said you all came in one car.
9    So, you all went to the hospital at that
10    time?  You and your sister and your
11    father-in-law?

12    A    Yes.

13    Q    Have you been back to shop at that
14    Wal-Mart?

15    A    Yes.

16    Q    About how far is that Wal-Mart from
17    your house?

18    A    Ten miles.

19    Q    It's the closest Wal-Mart to your
20    house?

21    A    Uh-huh.

22    Q    They're all over sometimes.  So,
23    sometimes, you never know.  Do you have any
24    children?

25    A    Yes, I do.

```
 1              IN THE U. S. DISTRICT COURT

 2         FOR THE MIDDLE DISTRICT OF ALABAMA

 3                  SOUTHERN DIVISION

 4

 5    MARGARET WILLIAMS,

 6         PLAINTIFF,

 7      VS.                    CASE NO. 1:07CV1108-MHT

 8    WAL-MART STORES, INC.,
      ET AL.,
 9
           DEFENDANTS.
10

11      The deposition of MARGARET WILLIAMS,

12    taken by the Defendants, pursuant to the

13    Federal Rules of Civil Procedure, before

14    Stacey Watkins, RPR, and Notary Public, State

15    at Large, at the offices of Cochran, Cherry,

16    Givens, Smith, Lane & Taylor, Dothan,

17    Alabama, on the 1st day of May, 2008, at

18    10:05 a.m., CDT, pursuant to notice.

19                  *  *  *  *  *

20    APPEARANCES:

21    FOR THE PLAINTIFF:      FOR THE DEFENDANTS:

22    MR. LARRY GIVENS        MS. JENNIFER A. DOUGHTY
      Attorney at Law         Attorney at Law
23    Dothan, Alabama         Mobile, Alabama

24

25
```



PLAINTIFF'S
EXHIBIT

Blumberg No. 5113

17

1          do we mean anybody else in the
2          whole store, or do we mean,
3          like, her sister?
4          MS. DOUGHTY: I'm going to get into
5          that.
6          MR. GIVENS: Go ahead. I'm sorry.
7          MS. DOUGHTY: That's okay.
8      Q    Was your sister walking beside you,
9  in front of you, behind you? Do you happen
10 to recall where she was?
11     A    She had already checked out and had
12 exited the store.
13     Q    So, she was outside the vicinity of
14 the store?
15     A    Yes.
16     Q    Had left the exit door --
17     A    Right.
18     Q    -- and was outside, essentially in
19 the parking lot?
20     A    Yes.
21     Q    Do you know if any Wal-Mart
22 employees saw your fall as it happened?
23     A    I'm not sure.
24     Q    Okay. Do you know if any Wal-Mart
25 employees saw anything on the floor prior to

18

1  your fall?
2      A    No. I'm not -- no.
3          MR. GIVENS: No, you don't know,
4          or, no, they didn't see it?
5      A    No, I don't know if they saw
6  anything.
7      Q    After your fall, did you see what
8  you --
9      A    No.
10     Q    -- maybe slipped on?
11     A    No.
12     Q    You didn't see any substance of any
13 kind on the floor?
14     A    No. I was just told at the store,
15 while I was in the store.
16     Q    And what were you told at the
17 store?
18     A    I was told that there was water
19 there and a skid mark there, a red skid mark.
20     Q    Do you recall who told you that?
21     A    They were talking about it in the
22 store, the store owners. People were taking
23 pictures.
24     Q    And where were you at the time they
25 were talking about that?

19

1      A    On the floor.
2      Q    And where were you at the time they
3  were taking pictures?
4      A    On the floor.
5      Q    You mentioned earlier that they
6  moved you after you fell. Where did they
7  move you to?
8      A    The paramedic moved me,
9  straightened me up.
10     Q    Was the paramedic called to the
11 store?
12     A    I was very blessed. They were
13 called, yes. I should have said "yes."
14     Q    Do you happen to know if a Wal-Mart
15 employee called that paramedic?
16     A    No, I don't know.
17     Q    So, a paramedic showed up and was
18 there to assist you?
19     A    I'd have to say something. There
20 was a paramedic out in the car. His wife was
21 in the store, and his little boy or little
22 girl. I'm not sure. I was listening. And
23 they said that either the wife went after or
24 sent the little boy after his daddy to come
25 in. He was a paramedic, off duty. Had the

20

1  paramedic clothes on and stuff, though. He
2  came in and assisted me 'til the other
3  paramedics got there. He's the one that
4  moved me.
5      Q    So, it's your understanding that a
6  witness who was a shopper in the store went
7  to somehow get her husband, who was a
8  paramedic, and he came and assisted you?
9      A    Yes.
10     Q    And he personally moved you from
11 where you fell?
12     A    He just -- like I said, he
13 straightened my body up.
14     Q    And he straightened your body up by
15 moving your legs around so they were
16 straight?
17     A    No. He moved my body.
18     Q    Your entire body?
19     A    Not just my legs.
20     Q    About how far did he move your
21 body?
22     A    Not very far at all. Just to
23 straighten me up.
24     Q    Okay. You mentioned earlier that
25 the store was taking pictures. About how far

PLAINTIFF'S
EXHIBIT
W. Williams Dep
Exhibit 3
Reporters No. 6513